1   JEFFER MANGELS BUTLER & MITCHELL LLP
    BENNETT G. YOUNG (Bar No. 106504)
2   *byoung@jmbm.com*
    Two Embarcadero Center, 5th Floor
3   San Francisco, California 94111-3813
    Telephone:    (415) 398-8080
4   Facsimile:    (415) 398-5584

5   Attorneys for Debtor and Debtor-in-Possession
    ARADIGM CORPORATION

6

7

8                   UNITED STATES BANKRUPTCY COURT

9           NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

10  In re                                    Case No. 19-40363-WJL

11  ARADIGM CORPORATION,                     Chapter 11

12                                           **DEBTOR'S MODIFIED COMBINED
                                             CHAPTER 11 PLAN AND DISCLOSURE**
13                Debtor.                     **STATEMENT (DATED JUNE 8, 2020)**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INTRODUCTION

This Modified Combined Chapter 11 Plan and Disclosure Statement (Dated June 8, 2020) (the "Plan") provides for the distribution of the proceeds of the liquidation of the assets of Aradigm Corporation (hereinafter referred to as "Aradigm"), the debtor-in-possession in a case (the "Bankruptcy Case") pending under chapter 11 of Title 11 of the United States Code before the United States Bankruptcy Court for the Northern District of California, Oakland Division (the "Bankruptcy Court"), to Aradigm's creditors and, after creditors are paid in full with interest, to shareholders. The Plan is proposed by Aradigm. If confirmed, this Plan will bind all creditors and shareholders provided for in this Plan, whether or not they file a proof of claim or interest or accept this Plan, and whether or not their claims or interests are allowed.

You may be entitled to vote on the Plan, or to object to confirmation of the Plan or final approval of the Disclosure Statement. Ballots must be received by Aradigm's counsel on or before June 1, 2020, and objections to the Plan or Disclosure Statement must be filed with the Court, on or before June 1, 2020. A hearing on confirmation of the Plan and final approval of the Disclosure Statement will be held on June 10, 2020. Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. All creditors and shareholders should refer to Part 3 of this Plan for information regarding the precise treatment of their claims, and to Part 9 for voting instructions. No statements concerning Aradigm or its assets are authorized other than those set forth herein,

## PART 1
## EXECUTIVE SUMMARY[1]

The Bankruptcy Court directed Aradigm to provide this brief summary of the Plan. The purpose of this summary is to provide a quick and ready description of Aradigm, the reasons Aradigm filed the Bankruptcy Case, and of the major events that occurred in the Bankruptcy Case. This summary also describes the major decision to be made by parties in interest in voting on the

---

[1] Further detail regarding Aradigm, its capital structure and the events that lead to the filing of the Bankruptcy Case are set forth in Exhibit A.

JMBM | Jeffer Mangels Butler & Mitchell LLP

67987881v2

Plan. That decision is whether to vote to accept the Plan and implement the liquidating trust mechanism proposed by Aradigm to collect the deferred compensation to be paid by the purchaser of Aradigm's assets or to vote to reject the Plan and convert the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code. Further details are provided below and in Exhibit A attached to this Plan.

Aradigm is a publicly traded emerging specialty pharmaceutical company focused on the development and commercialization of products for the treatment and prevention of severe respiratory diseases. Aradigm's lead product candidate completed two Phase 3 trials. However, the Federal Drug Administration ("FDA") declined to approve the drug and requested that Aradigm conduct an additional Phase 3 trial. Aradigm estimated that a Phase 3 trial would cost approximately $75 million and take at least three years to complete.

Addressing the delays Aradigm experienced obtaining regulatory approval and the FDA's request for an additional Phase 3 trial would have required significant expenditures which Aradigm lacked the capital to fund. Grifols, S.A. ("Grifols"), Aradigm's principal funding partner, indicated that it was unwilling to fund the new Phase 3 trial and that it was unwilling to continue to fund Aradigm. Aradigm therefore determined that it needed to seek a buyer for its assets. Aradigm filed this chapter 11 case on February 15, 2019 (the "Petition Date") in order to conserve its cash resources and to pursue a sale of its assets.

From the outset of the Bankruptcy Case Aradigm's objective was to pursue a sale of its assets. The sales process was extremely complex as a result of the License and Collaboration Agreement (the "Grifols License") between Grifols and Aradigm. In broad terms, the Grifols License distinguishes between the right to pursue regulatory approval of Aradigm's drug candidates, Aradigm's intellectual property, and the right to manufacture the product, on the one hand, and the right to commercialize the product once approved on the other. In the Grifols License, Aradigm granted to Grifols an exclusive worldwide license to commercialize the product, in return for milestone payments and a royalty stream once the product was commercialized, while Aradigm retained ownership of the intellectual property and the exclusive right to pursue regulatory approval and to manufacture the product. Thus, Grifols controls the commercial rights

67987881v2

JMBM Jeffer Mangels Butler & Mitchell LLP

to the product, while Aradigm controls the development and owns the underlying intellectual property.

Due to the complexity of Aradigm's assets, the sales process was delicate and difficult. Aradigm retained EMA Partners, LLC ("EMA Partners") to act as its investment banker and to assist Aradigm in the sale process. EMA Partners conducted a robust sales process. EMA Partners identified and contacted over 50 potentially interested parties. Fourteen of these parties expressed interest and evaluated the opportunity. As a result of these efforts, there were multiple interested parties. One of these interested parties submitted a bid. This bid was subject to significant contingencies which, in Aradigm's view, made the bid unattractive.

Grifols made a proposal to Aradigm to purchase Aradigm's assets. The proposal contemplated a cash payment, additional cash payments upon the achievement of certain milestones and royalty payments based upon sales of the product. After negotiations, Aradigm determined that Grifols' proposal was the superior bid. Aradigm therefore accepted Grifols' proposal and encouraged the competing bidder to submit a higher and better bid at the auction.

The Grifols License was a significant complicating factor. Grifols advised Aradigm that Grifols simultaneously was negotiating a transaction with a third party (Party X). Aradigm understood that as a practical matter Aradigm's transaction with Grifols was contingent on the successful outcome of Grifols' negotiations with Party X.

Grifols and Aradigm signed an asset purchase agreement ("APA") on February 18, 2020. The APA provided that the sale was subject to overbids through an auction process in the Bankruptcy Court and did not impose any limitations on Aradigm's ability fully to market its assets to other interested parties.

Under the APA, Aradigm agreed to sell all of its intellectual property assets and certain other assets to Grifols. The purchase price was $3,247,000 in cash payable at closing, plus milestone payments amounting to an additional $3 million (the "Milestone Payments") and a royalty of 25% of the royalties received by Grifols during the royalty term in connection with the sale of any Aradigm Product under any definitive agreement between Grifols and any licensee for the development and commercialization of any Aradigm Product (the "Royalty Payments"). The

JMBM | Jeffer Mangels
Butler & Mitchell LLP

67987881v2

Milestone Payments are payable $2 million upon FDA approval of any Aradigm Product and $1 million upon EMA approval of any Aradigm Product. The royalty term is the shorter of 10 years after the first commercial sale of an Aradigm Product or the expiration of the last Aradigm Patent covering an Aradigm Product. In addition, Grifols and its affiliate Grifols Worldwide Operations, Limited, agreed to waive their filed proofs of claim in the Bankruptcy Case in the total amount of $31,735,898.90.

After the APA was signed, Aradigm and EMA Partners continued to market Aradigm's assets to interested parties. However, no party submitted a competing bid. Aradigm therefore cancelled the scheduled auction and requested that the Court approve the sale to Grifols on the terms set forth in the APA. On March 30, 2020 the Bankruptcy Court entered an order approving the sale. The sale closed on March 31, 2020. After repayment of the DIP Loans as described below, and payment of certain cure costs, Aradigm received net cash proceeds of $834,933.

The remainder of the consideration payable to Aradigm is in the form of the Milestone Payments and the Royalty Payments. Whether and when Aradigm will receive the Milestone Payments and the Royalty Payments is uncertain and subject to several risks. In particular:

- Aradigm understands that Grifols licensed the rights it purchased from Aradigm to Party X and that Party X will undertake the necessary clinical trials and, if those trials are successful, Party X will market and sell the drug. The possibility exists that Party X will be unable to complete the clinical trial or the trial will be unsuccessful. Aradigm is aware that Party X is currently pursuing clinical trials for certain of Party X's other assets. These other clinical trials will require a significant investment by Party X which could affect Party X's ability successfully to complete the clinical trials of the Aradigm product.

- Aradigm estimates that the process to obtain FDA and EMA approval could take up to 5 years. Moreover, there is no assurance that either or both approvals will be obtained. Whether and when US or European approval of an Aradigm product will be obtained, triggering Aradigm's right to receive the Milestone Payments, is uncertain. Thus, the Milestone Payments will likely not be received for as much as 5 years, and might not be received at all.

- The timing and amount of Royalty Payments is uncertain because it is dependent on successful marketing and sale of any resulting product which has received regulatory approval. The royalty term is the shorter of ten years after the first commercial sale of an Aradigm Product or the expiration of the last Aradigm Patent covering an Aradigm Product, meaning that the deferred consideration payable to Aradigm is payable over a period of up to 15 years.

- If neither FDA nor EMA approval is obtained, there will be no Milestone Payments, no sales of the Aradigm product and no Royalty Payments.

This Plan provides for the creation of a Liquidating Trust, to be administered by a Liquidating Trustee, to collect, sell or otherwise dispose of the assets of Aradigm's estate, including the contingent, deferred consideration received from the sale of Aradigm's assets, and to distribute the net proceeds to creditors and shareholders. Aradigm has no secured creditors. The Plan places all prepetition priority unsecured creditors in one class, places all general unsecured creditors in a single class and places all shareholders in a single class. The term of this Plan is five years, unless extended by order of the Court.

The Liquidating Trust will be funded by Aradigm's cash on hand. The Liquidating Trust will not receive significant additional cash, if at all, until the Milestone Payments are received in approximately 3 to 5 years. Aradigm projects that its cash will be sufficient to pay all administrative expenses on the Effective Date of the Plan, to fund payment in full of the Class 1 priority wage claims and to fund the Liquidating Trust's operations until the Milestone Payments are received. The Liquidating Trust most likely will not have significant activity unless and until the Milestone Payments are received. Furthermore, no distribution will be made to class 2 unsecured creditors unless and until the Milestone Payments are received and no distribution will be made to class 3 equity holders unless and until sufficient Milestone Payments and Royalty Payments have been received to pay class 2 unsecured creditors in full with interest.

The Trustee of the Liquidating Trust shall be subject to the oversight of Bleichroeder, L.P. ("Bleichroeder"). Bleichroeder is Aradigm's second largest shareholder, holding through the investment funds it manages approximately 26% of Aradigm's stock, and is now its largest creditor, with a claim based on notes and convertible notes of approximately $4.4 million. So long as the Bankruptcy Case remains open, the Trustee of the Liquidating Trust shall file with the Bankruptcy Court and serve upon Bleichroeder the Quarterly Post-Confirmation Reports required by Section 7.2 of the Guidelines of the Office of the United States Trustee. After the Bankruptcy Case is closed, for so long as the Liquidating Trust shall remain in existence, the Trustee of the Liquidating Trust shall prepare and send Bleichroeder an annual report of the cash receipts and disbursements of the Trust. In addition, the Trustee of the Liquidating Trust shall send the information requested by holders of allowed claims and interests as provided in Section 3.4 of the

JMBM | Jeffer Mangels Butler & Mitchell LLP

67987881v2

Case: 19-40363   Doc# 235   Filed: 06/08/20   Entered: 06/08/20 14:01:38   Page 6 of 38
DEBTOR'S MODIFIED COMBINED CHAPTER 11 PLAN AND DISCLOSURE STMNT (DTD JUNE 8, 2020)

Liquidating Trust Agreement. Aradigm believes that requiring the Liquidating Trustee to report only to Bleichroeder, the largest creditor and second largest shareholder, is protective of creditors and shareholders and is the most efficient and cost effective way to proceed. The Bankruptcy Court has advised that any creditor or shareholder that disagrees or objects may make its views known at the hearing to confirm the Plan on June 10, 2020.

The alternative to the Plan is to convert the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code. If this were to occur, a chapter 7 trustee would be appointed to administer Aradigm's assets, including collection of the Milestone Payments and the Royalty Payments and the distribution of the proceeds to creditors and, after creditors are paid in full, plus interest, to shareholders.

Aradigm believes that the creation of the Liquidating Trust and the appointment of a liquidating trustee is superior to conversion of the Bankruptcy Case to chapter 7 and the appointment of a chapter 7 trustee for the following reasons:

- A chapter 7 trustee is statutorily directed to close the bankruptcy estate "as expeditiously as is compatible with the best interests of parties in interest." 11 U.S.C.§ 704(a)(1). The directive to close the case expeditiously could create an incentive for the chapter 7 trustee to sell the rights to receive the future Milestone Payments and the future Royalty Payments at a discount.

- Furthermore, the statutory directive is inconsistent with the potential 15 year term for the receipt of the Milestone Payments and the Royalty Payments. Aradigm believes that a liquidating trustee is better situated to collect these payments over the potentially lengthy term.

- A liquidating trust receives favorable tax treatment compared to a chapter 7 bankruptcy estate.

- A chapter 7 trustee will be more expensive if the Milestone Payments and the Royalty Payments are received. A chapter 7 trustee is entitled to the statutory commission calculated as provided in 11 U.S.C.§ 704(a)(1) on all funds distributed by the trustee while the liquidating trustee will be paid an hourly rate. The statutory commission is a sliding scale for amounts distributed under $1 million and is three percent (3%) of all amounts over $1 million. Aradigm submits that if the Milestone Payments and the Royalty Payments are received, the chapter 7 trustee's three percent statutory commission will be higher than the hourly fee charged by the liquidating trustee.

- Finally, Aradigm believes that a liquidating trust will better protect the interests of creditors and shareholders, particularly with respect to making distributions to shareholders many years in the future if sufficient Royalty Payments to fund such payments are received.

67987881v2

Case: 19-40363   Doc# 235   Filed: 06/08/20   Entered: 06/08/20 14:01:38   Page 7 of 38
DEBTOR'S MODIFIED COMBINED CHAPTER 11 PLAN AND DISCLOSURE STMNT (DTD JUNE 8, 2020)

7

**PART 2**
**EVENTS SINCE THE FILING OF THE BANKRUPTCY CASE**

A.      <u>The Decision to File the Bankruptcy Case</u>

Addressing the delays Aradigm experienced obtaining regulatory approval and the FDA's request for an additional Phase 3 trial would have required significant expenditures by Aradigm on additional research, administrative expenses, and development and regulatory activities. Aradigm lacked the capital to fund these expenditures. Grifols, Aradigm's principal funding partner, indicated that it was unwilling to fund the new Phase 3 trial requested by the FDA. In January 2019 Grifols advised Aradigm that Grifols was unwilling to continue to fund Aradigm. Aradigm therefore determined that it needed to seek a buyer for its assets.

Aradigm recognized that its assets are complex and a sales process was likely to be lengthy. Aradigm therefore took steps to conserve its cash in order to have as much of a runway to pursue a sale as possible. A major expense coming due in February 2019 was the premium to renew Aradigm's directors' and officers' insurance policy. That policy was due to expire on February 15, 2019. The Debtor received a quote to renew the policy for an additional one year term for a premium of approximately $1.3 million, which was approximately 40% of Aradigm's cash on hand at that time.

If Aradigm did not renew the policy, the members of its board of directors likely would resign. Thus, Aradigm had the choice of purchasing the D&O policy, which would leave it with little cash and therefore limited runway to pursue a sales process for its assets, or to allow the policy to lapse, which would probably result in the resignation of the Board and the officers but would leave Aradigm with a longer runway to pursue a sale. Aradigm determined that it was not in the best interests of its creditors and shareholders to purchase the D&O policy and therefore allowed the policy to expire. As expected, Aradigm's Board, after authorizing the filing of a chapter 11 case, resigned, as did Aradigm's officers. Aradigm filed this chapter 11 case on the Petition Date in order to conserve its cash resources and to pursue a sale of its assets.

/ / /

/ / /

DEBTOR'S MODIFIED COMBINED CHAPTER 11 PLAN AND DISCLOSURE STMNT (DTD JUNE 8, 2020)

Jeffer Mangels Butler & Mitchell LLP

JMBM

**B.** **Aradigm Files the Bankruptcy Case and Commences A Process to Market and Sell its Assets to the Highest Bidder**

On the Petition Date Aradigm commenced a voluntary case under chapter 11 of the Bankruptcy Code. Aradigm continues to operate its business and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Bankruptcy Case. No official committees have been appointed.

From the outset Aradigm's objective was to pursue a sale of its assets. Due to the complexity of Aradigm's assets, the sales process was delicate and difficult. After the Petition Date, Aradigm explored selling its assets without using an investment banker. Grifols made a proposal to Aradigm to purchase Aradigm's assets which Aradigm found unacceptable. Aradigm made two alternative counter-proposals to Grifols, to which Grifols did not respond.

Aradigm therefore concluded that it needed to retain an investment banker to effectively market its assets. Aradigm interviewed three candidates and selected EMA Partners to act as its investment banker. Aradigm filed its application to retain EMA Partners with the Bankruptcy Court on April 24, 2019. Grifols objected to the application. After hearings before the Bankruptcy Court, the application was approved by order entered on May 31, 2019.

EMA Partners conducted a robust sales process. EMA Partners identified and contacted over 50 potentially interested parties. Fourteen of these parties expressed interest and evaluated the opportunity. As a result of these efforts, there were multiple interested parties. One of these interested parties submitted a bid. This bid was subject to significant contingencies which, in Aradigm's view, made the bid unattractive.

Grifols subsequently made another proposal to Aradigm. The proposal contemplated a cash payment, additional cash payments upon the achievement of certain milestones and royalty payments based upon sale of the product. After negotiations, Aradigm determined that Grifols' proposal was the superior bid. Aradigm therefore accepted Grifols' proposal and encouraged the competing bidder to submit a higher and better bid at the Auction.

Grifols and Aradigm signed a non-binding letter of intent. Grifols proposed a draft asset

67987881v2

DEBTOR'S MODIFIED COMBINED CHAPTER 11 PLAN AND DISCLOSURE STMNT (DTD JUNE 8, 2020)

JMBM | Jeffer Mangels Butler & Mitchell LLP

1  purchase agreement and the parties extensively negotiated the terms of the APA. The parties

2  reached agreement on the terms of the APA and on February 18, 2020 the APA was signed by the

3  parties. The APA provided that the sale was subject to overbids through an auction process in the

4  Bankruptcy Court and did not impose any limitations on Aradigm's ability fully to market its

5  assets to other interested parties.

6      While negotiations over the APA were ongoing, EMA Partners remained in contact with

7  other interested potential bidders and worked to prepare such bidders for the process. EMA

8  Partners believed that a third party's interest in bidding on the Aradigm assets would be contingent

9  on a third party's ability to secure access to the commercial rights which were controlled by

10  Grifols. In light of that, EMA Partners had conference calls with some of the potential bidders to

11  encourage them to evaluate the Aradigm assets prior to commencement of an auction, and to

12  facilitate conversations with Grifols to explore a potential license arrangement for such

13  commercial rights.

14      The Grifols License was a significant complicating factor. Grifols advised Aradigm that

15  Grifols simultaneously was negotiating a transaction with a third party (Party X). Since March

16  2019 Party X has engaged in significant due diligence, and Aradigm has expended significant time

17  and resources to respond to Party X's due diligence requests.

18      Aradigm understood that as a practical matter Aradigm's transaction with Grifols was

19  contingent on the successful outcome of Grifols' negotiations with Party X. Aradigm also

20  understood that Grifols and Party X may be parties to an exclusivity agreement, the terms of

21  which were unknown to Aradigm. Moreover, a portion of the consideration payable to Aradigm in

22  the transaction was milestone payments and royalties. As a result, the value of the transaction for

23  Aradigm is dependent on the future performance by Party X in running clinical trials and

24  commercializing the product.

25      The possibility exists that Party X will be unable to complete the clinical trial or the trial

26  will be unsuccessful. Aradigm is aware that Party X is currently pursuing clinical trials for certain

27  of Party X's other assets. These other clinical trials will require a significant investment by Party X

28  which could affect Party X's ability successfully to complete the clinical trials of the Aradigm

JMBM | Jeffer Mangels Butler & Mitchell LLP

67987881v2

Case: 19-40363   Doc# 235   Filed: 06/08/20   Entered: 06/08/20 14:01:38   Page 10 of
38
DEBTOR'S MODIFIED COMBINED CHAPTER 11 PLAN AND DISCLOSURE STMNT (DTD JUNE 8, 2020)

10

product.

Aradigm therefore was focused on insuring, to the greatest extent possible, that there would be an open auction process. It was critical that the ultimate purchaser have the resources and the obligation to continue to seek regulatory approval of the product. Thus, the APA provided that if a competing bidder is the winning bidder at the Auction, Grifols' exclusivity obligations are terminated such that Grifols is free to negotiate with the successful bidder. Furthermore, the APA provides that Grifols is obligated to require its licensee to use commercially reasonable efforts to obtain and support regulatory approval of the product.

### C.   Aradigm Sells its Assets to Grifols

#### 1.   Terms of Sale

Under the APA, Aradigm agreed to sell all of its intellectual property assets and certain other assets to Grifols. The purchase price was $3,247,000 in cash payable at closing, plus milestone payments amounting to an additional $3 million (the "Milestone Payments") and a royalty of 25% of the royalties received by Grifols during the royalty term in connection with the sale of any Aradigm Product under any definitive agreement between Grifols and any licensee for the development and commercialization of any Aradigm Product (the "Royalty Payments"). The Milestone Payments are payable $2 million upon FDA approval of any Aradigm Product and $1 million upon EMA approval of any Aradigm Product. The royalty term is the shorter of 10 years after the first commercial sale of an Aradigm Product or the expiration of the last Aradigm Patent covering an Aradigm Product. In addition, Grifols and its affiliate Grifols Worldwide Operations, Limited, agreed to waive their filed proofs of claim in the Bankruptcy Case in the total amount of $31,735,898.90.

Aradigm assumed and assigned to the purchaser certain executory contracts. The contract counterparty certain of the contracts is Oregon State University, the contract counterparty on others is Exelead, Inc., and the contract counterparty on the remaining assigned contracts is Grifols. Aradigm paid $247,000 to Exelead, Inc. to cure all defaults under the contracts with it and $20,971.41 to cure all defaults under two of the contracts with Oregon State University. No cure payments were due and owing with respect to the contracts with Grifols. In addition, Aradigm

Jeffer Mangels
Butler & Mitchell LLP

JMBM

67987881v2

DEBTOR'S MODIFIED COMBINED CHAPTER 11 PLAN AND DISCLOSURE STMNT (DTD JUNE 8, 2020)

agreed to pay an additional $44,296.66 from the proceeds of a National Institute of Health grant in favor of Aradigm when such proceeds are received to cure the defaults under certain other assigned contracts with Oregon State University.

**2.     Risk Factors**

Aradigm estimates that the process to obtain FDA and EMA approval could take up to 5 years. Moreover, there is no assurance that either or both approvals will be obtained. Whether and when US or European approval of an Aradigm product will be obtained, triggering Aradigm's right to receive the Milestone Payments, is uncertain. Thus, the Milestone Payments will likely not be received for as much as 5 years, and might not be received at all.

Similarly, the timing and amount of Royalty Payments is also uncertain because it is dependent on successful marketing and sale of any resulting product which has received regulatory approval. The royalty term is the shorter of ten years after the first commercial sale of an Aradigm Product or the expiration of the last Aradigm Patent covering an Aradigm Product, meaning that the deferred consideration payable to Aradigm is payable over a period of up to 15 years. If neither FDA nor EMA approval is obtained, there will be no sales of the Aradigm product and therefore no Royalty Payments.

**3.     Rough Estimate of the Value of the Projected Royalty Payments**

Aradigm has attempted to estimate the value of the Royalty Payments. The information available to Aradigm permits only a very rough estimate. The Royalty Payments are 25% of the royalties received by Grifols during the royalty term in connection with the sale of any Aradigm Product under any definitive agreement between Grifols and any licensee for the development and commercialization of any Aradigm Product. Aradigm understands that Grifols' licensee is Party X, but Aradigm does not know the terms of the agreement between Grifols and Party X. Aradigm therefore does not know what royalties Grifols is entitled to receive, 25% of which go to Aradigm.

Aradigm understands that Party X agreed to pay to Grifols a tiered, low double-digit royalty based on annual global net sales, which is subject to reduction if another inhaled ciprofloxacin product is introduced into the market. Party X is obligated to make such royalty payments on a country-by-country and product-by-product basis until the later of (1) 10 years after

JMBM | Jeffer Mangels Butler & Mitchell LLP

the first commercial sale of a product in a country, (2) expiration of the last patent covering that product in that country, or (3) the date a generic inhaled liposomal ciprofloxacin is introduced in that country.

Aradigm's right to the Royalty Payments depends upon the volume of sales of the Aradigm product after regulatory approval is obtained as described above. In 2018 when Aradigm was pursuing regulatory approval, estimates of commercial sales over the Royalty Term ranged from $350 million to as high as $1 billion. Actual sales could be more or less than these estimates.

Based on the available information, EMA Partners, Aradigm's investment bankers, constructed a financial model to value the royalty stream. The model is based on several key assumptions, including market size and the royalty rate payable to Grifols by Party X. The model incorporates Aradigm's estimate of market size and other financial assumptions provided by Aradigm and from third party sources, which have not been independently verified by EMA Partners. Aradigm also made its best guess as to the royalty rate payable to Grifols by Party X. Aradigm's guess is based upon statements by Grifols and Party X, but Aradigm has not reviewed the license agreement between them, and therefore Aradigm can only speculate. Aradigm estimated the total royalties that might be paid over time, based on (a) the guess as to the royalty rate; (b) sales projections; and (c) an estimate of market size and percentage of market penetration for a successful product. Neither Aradigm nor EMA Partners makes any representations or warranties with regard to future financial performance of the products.

The Milestone Payments and Royalty Payments are payable over a term of up to 15 years. EMA Partners therefore discounted the projected payment stream to present value at a discount rate of 20% to arrive at an estimated net present value of $25,187,000. This is an estimate only. The actual amounts received may vary from the amounts forecast.

### D.    Approval of the Bidding Procedures and of the Sale

After the APA was signed, Aradigm filed a motion to approve the bidding procedures set forth in the APA for the auction process and a motion to approve the sale to the party making the highest and best bid for its assets. The Bankruptcy Court modified the proposed bidding procedures and as modified approved them. Following approval of the bidding procedures,

DEBTOR'S MODIFIED COMBINED CHAPTER 11 PLAN AND DISCLOSURE STMNT (DTD JUNE 8, 2020)

67987881v2

JMBM | Jeffer Mangels
Butler & Mitchell LLP

Aradigm and its investment bankers continued to market Aradigm's assets to interested parties. However, no party submitted a competing bid. Aradigm therefore cancelled the scheduled auction and requested that the Court approve the sale to Grifols on the terms set forth in the APA. On March 30, 2020 the Bankruptcy Court entered an order approving the sale. The sale closed on March 31, 2020. After repayment of the DIP Loans as described below, and payment of the cure amounts to Exelead, Inc. and Oregon State University as described above, Aradigm received net cash proceeds of $834,933.

### E. The DIP Loan

Aradigm believed that one key to a successful sales process was to have adequate time to market its assets effectively. This was especially true given the complexity of the ownership structure of Aradigm's assets. Grifols' exclusive rights to commercialize any Aradigm product was a complication in the sales process. Accordingly, in order to obtain additional funding and thereby provide increased runway to market and sell its assets, Aradigm entered into a debtor in possession loan agreement (the "DIP Loan") with two of the investment funds managed by Bleichroeder, 21 April Fund, Ltd. and 21 April Fund, L.P. (the "DIP Lenders"). The DIP Loan was approved by order of the Bankruptcy Court entered on June 6, 2019. The principal balance owing is $2 million, plus interest, and the DIP Loan is secured by a security interest in substantially all of Aradigm's assets. The DIP Loan, plus interest was repaid from the proceeds of the sale. The total amount repaid was $2,144,096.

### F. Rejection of Lease and Disposition of Surplus Equipment

In order to conserve cash, Aradigm determined to reject is office lease and to move to a less expensive location. Aradigm therefore filed motions to reject the lease, to abandon certain equipment and to sell certain other equipment. These motions all were granted by the Bankruptcy Court.

### PART 3
### CLASSIFICATION AND TREATMENT OF CLAIMS

Claims are classified below (except for administrative priority claims) for all purposes, including voting, confirmation and distributions pursuant to this Plan. A claim is classified in a

6798788lv2

DEBTOR'S MODIFIED COMBINED CHAPTER 11 PLAN AND DISCLOSURE STMNT (DTD JUNE 8, 2020)

JMBM | Jeffer Mangels Butler & Mitchell LLP

particular class only to the extent the claim qualifies within the description of the class and is classified in a different class to the extent that any remainder of the claim qualifies within the description of such different class. A claim is in a particular class only to the extent that the claim is an allowed claim pursuant to Bankruptcy Code Section 502 and has not been paid, released or otherwise satisfied before the Effective Date of the Plan. The following is a summary of the treatment of each class proposed under this Plan:

| Class | Description | Proposed Treatment | Entitled to Vote? |
|---|---|---|---|
| 1 | Priority Wage and Priority Tax Claims | Paid in Full From Cash on Hand Within 30 Days of the Effective Date | Yes |
| 2 | General Unsecured Creditors | *Pro Rata* Payment From Milestone Payments and Royalty Payments, if and When Received | Yes |
| 3 | Shareholders | *Pro Rata* Payment From Milestone Payments and Royalty Payments, if and when received, after Class 2 is paid in full, with interest | Yes |

Disputes regarding proper classification of claims not specifically classified in this Plan shall be resolved pursuant to the procedures established by the Bankruptcy Code, other applicable law and procedures and this Plan; resolution of such disputes shall not be a condition to the confirmation or consummation of this Plan.

**Class 1:        Priority Claims**

This class consists of the priority wage claims held by Aradigm's former employees and any priority tax claims. Aradigm believes that all priority taxes have been paid and that there are no priority tax claims. There are approximately $154,200 of priority wage claims.

1.        Classification. This class consists of allowed claims entitled to priority under Bankruptcy Code Section 507(a)(4) and allowed claims entitled to priority under Bankruptcy Code Section 507(a)(8).

2.        Treatment. Within thirty (30) calendar days of the Effective Date of this Plan, each holder of an allowed claim in this class shall receive a single payment equal to 100% of such

15

DEBTOR'S MODIFIED COMBINED CHAPTER 11 PLAN AND DISCLOSURE STMNT (DTD JUNE 8, 2020)

6798788lv2

JMBM | Jeffer Mangels Butler & Mitchell LLP

holder's allowed claim. Claims in this class shall not accrue interest.

3.    _Impairment_. This class is impaired and is entitled to vote upon this Plan.

**Class 2:        Claims of General Unsecured Creditors**

This class consists of the claims held by general unsecured creditors. Aradigm is not presently able to project the timing or the amount of distributions on account of general unsecured claims with any certainty. As described in Section 3 above, Aradigm's assets were sold to Grifols for cash and deferred, contingent compensation consisting of the right to receive the Milestone Payments and the Royalty Payments. Whether and when USA or European approval of an Aradigm Product will be obtained, triggering Aradigm's right to receive the Milestone Payments, is uncertain. Similarly, because Aradigm's right to the Royalty Payments depends upon the volume of sales of Aradigm product after regulatory approval is obtained, the timing and amount of Royalty Payments is also uncertain.

Aradigm projects that the cash held by the estate on the Effective Date will not be sufficient to make a distribution to holders of allowed class 2 claims and that the Liquidating Trust formed by this plan most likely will not have sufficient cash to make a distribution to holders of allowed class 2 claims unless and until at least one of the Milestone Payments in received which likely will not be until up to 5 years after the Effective Date. As a result, there most likely will not be a distribution to holders of allowed  class 2 claims until Aradigm shall have received at least one of the Milestone Payments.

1.    _Classification_. This class consists of the allowed claims held by general unsecured creditors.

2.    _Treatment._ Holders of allowed claims in this class shall be paid _pro rata_ from funds received by the Liquidating Trust on account of the Milestone Payments and the Royalty Payments after payment of administrative priority expenses. Distributions to holders of allowed Class 2 claims shall be made until all such claims have been paid in full plus interest at the fixed rate of 2.6% from and after the Petition Date.

3.    _Impairment_. This class is impaired and is entitled to vote upon this Plan.

67987881v2

JMBM | Jeffer Mangels Butler & Mitchell LLP

**Class 3:** **Shareholders**

    1.    <u>Classification</u>. This class consists of the allowed interests held by shareholders of record as of the Effective Date, including all warrants and issued shares.

    2.    <u>Treatment</u>. On the Effective Date all interests in Aradigm, including all warrants, unexercised options, and issued shares, shall be cancelled. Holders of allowed interests shall receive *pro rata* distributions from funds received by the Liquidating Trust on account of the Milestone Payments and the Royalty Payments after payment of administrative priority expenses and after payment in full, plus interest, of allowed Class 2 claims. Distributions to holders of allowed Class 3 interests shall be made until all assets of the estate have been reduced to cash and distributed.

    3.    <u>Impairment</u>. This class is impaired and is entitled to vote upon this Plan.

**PART 4**
**PRIORITY CLAIMS AND EXPENSES OF ADMINISTRATION**

Claims entitled to administrative priority under Bankruptcy Code Section 507(a)(2) are not classified. Each administrative priority claim shall be paid in full on the later of the Effective Date of this Plan or the date such claim becomes an allowed claim, whichever is later, unless the holder of such claim consents to different treatment; provided, however, that administrative claims incurred in the ordinary course of business shall be paid in accordance with the terms and conditions of any agreements pertaining thereto.

    (a)    <u>Professional Fees</u>. Professional fees incurred prior to confirmation of this Plan may be paid only upon approval by the Bankruptcy Court. Unpaid professional fees shall be paid on the Effective Date of the Plan or approval, unless the holder of a claim for professional fees consents to a later payment.

    Aradigm estimates that the estate will be subject to the following claims for professional fees as of the Effective Date of this Plan:

/ / /

/ / /

/ / /

6787881v2

JMBM | Jeffer Mangels Butler & Mitchell LLP

DEBTOR'S MODIFIED COMBINED CHAPTER 11 PLAN AND DISCLOSURE STMNT (DTD JUNE 8, 2020)

| Professional | Role | Estimated Claim |
|---|---|---|
| Jeffer Mangels Butler & Mitchell, LLP | Counsel for Aradigm | $275,000 |
| EMA Partners LLC | Investment Banker for Aradigm | $162,350 |
| Moss Adams LLP | Tax Accountants for Aradigm | $16,000 |
| Bozicevic Field & Francis, LLP | Patent counsel to Aradigm | $58,367 |
| Rose Ryan, Inc. | Technical accounting for Aradigm | $7,500 |
| | Total | $519,217 |

(b)     <u>U.S. Trustee Fees</u>. Any amount owed to the U.S. Trustee for fees payable under 28 U.S.C. § 1930 shall be paid in full on the Effective Date of the Plan. Commencing with the calendar quarter following the quarter in which the Effective Date occurs, the Trustee of the Liquidating Trust shall pay to the U.S. Trustee such amounts as are required to be paid under 28 U.S.C. § 1930(a)(6) until the within case is converted, dismissed, or closed. No U.S. Trustee's fees shall be payable for any period during which the case is closed notwithstanding any later re-opening thereof.

## PART 5
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Upon the Effective Date of this Plan, Aradigm shall reject all executory contracts and unexpired leases not by then assumed by a final order of the Bankruptcy Court. The last date upon which a proof of claim for damages arising from rejection of said executory contracts and unexpired leases may be filed shall be thirty (30) calendar days from the date the order confirming this Plan is entered. Upon the Effective Date of this Plan, Aradigm shall surrender any interest in property securing said executory contracts and unexpired leases.

In connection with the extension of the extension of certain of Aradigm's insurance policies, Aradigm's insurance carrier requested that Aradigm include certain provisions in this Plan. Aradigm agreed to this request. These provisions are set forth below.

Notwithstanding anything to the contrary in this Plan, the Confirmation Order, any bar date notice or claim objection, any other document related to any of the foregoing, or any other order of

JMBM | Jeffer Mangels Butler & Mitchell LLP

1  this Court (including, without limitation, any provision that purports to be preemptory or

2  supervening, grants an injunction or release, requires any party to opt out of any releases or

3  confers Bankruptcy Court jurisdiction): (i) nothing alters the rights and obligations of Aradigm

4  and Federal Insurance Company, Vigilant Insurance Company, and/or their respective affiliates

5  (collectively, and with each of their successors, "Chubb") under any insurance policies or any

6  related agreements issued by Chubb to Aradigm (the "Chubb Insurance Contracts"); (ii) nothing

7  modifies the coverage provided under any of the Chubb Insurance Contracts or the terms and

8  conditions thereof except that, on and after the Effective Date, the Liquidating Trust shall become

9  and remain liable in full for all of the obligations under the Chubb Insurance Contracts (including

10 those of Aradigm), regardless of whether such obligations arise before or after the Effective Date,

11 without the requirement or need for Chubb to file or serve a request, motion, or application for

12 payment of or proof of any Claim or Administrative Claim or file or object to any Cure

13 Claim/Amount/Notice (and further and for the avoidance of doubt, any claim bar date shall not be

14 applicable to Chubb); and (iii) the automatic stay of Bankruptcy Code section 362(a) if and to the

15 extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (a)

16 claimants with direct action claims against Chubb under applicable non-bankruptcy law to proceed

17 with their claims; (b) Chubb to administer, handle, defend, settle, and/or pay, in the ordinary

18 course of business and without further order of this Bankruptcy Court, (I) claims where a claimant

19 asserts a direct claim against Chubb under applicable non-bankruptcy law, or an order has been

20 entered by this Court granting a claimant relief from the automatic stay to proceed with its claim,

21 and (II) all costs in relation to each of the foregoing; and (c) Chubb to cancel any Chubb Insurance

22 Contracts, and take other actions (including any right or setoff and recoupment) relating to the

23 Chubb Insurance Contracts, to the extent permissible under applicable non-bankruptcy law, and in

24 accordance with the terms of the Chubb Insurance Contracts. All rights and obligations under the

25 Chubb Insurance Contracts shall be determined under the applicable Chubb Insurance Contracts

26 and applicable non-bankruptcy law.

27 / / /

28 / / /

## PART 6
## DISPUTED AND DISALLOWED CLAIMS

(a)  <u>Distribution on Allowed Claims and Interests Only</u>. The Trustee of the Liquidating Trust shall make distributions only on account of allowed claims and interests. If a creditor has filed a proof of claim, that claim is considered disputed only if a party-in-interest files an objection to the claim. If a party has not filed a proof of claim, but its claim is listed in Aradigm's schedules and is not scheduled as disputed, contingent, or unliquidated, such claim is considered disputed only if a party-in-interest files an objection to the claim.

(b)  <u>Delayed Distribution on Disputed Claims and Interests</u>. The Trustee of the Liquidating Trust shall make no distribution on account of a disputed claim or interest unless and until such claim is allowed by a final order or settlement in accordance with Part 13(d) of this Plan. If a disputed claim purports to be a secured claim and the purported collateral is sold, then the Trustee of the Liquidating Trust shall reserve an amount equal to the purportedly secured portion of the disputed claim and shall not distribute said amount until the dispute has been resolved by final order of the Court or settlement in accordance with Part 13(d) of this Plan. In all other cases, the Trustee of the Liquidating Trust shall reserve and withhold from distributions any amounts the Trustee deems necessary, in the Trustee's sole discretion, with regard to disputed claims or interests pending resolution of the dispute by final order of the Court or settlement in accordance with Part 13(d) of this Plan.

(c)  <u>Settlement of Disputed Claims</u>. The Trustee of the Liquidating Trust is authorized to settle and compromise a disputed claim in the Trustee's sole discretion without Court approval.

(d)  <u>Objections to Claims</u>. The Trustee of the Liquidating Trust is authorized to object to any claim or interest. There shall be no deadline for the Trustee of the Liquidating Trust to file objections to claims or interests. The Bankruptcy Case may be reopened for the purpose of filing objections to claims or interests. Aradigm anticipates that no objections to claims or interests will be filed unless and until the Milestone Payments are received. The failure to object to a claim or interest shall not be deemed to be a waiver of any objection to such claim or interest.

/ / /

left margin: JMBM | Jeffer Mangels Butler & Mitchell LLP

67987881v2

## PART 7
## MEANS OF EXECUTION

(a)    <u>Creation of the Trust</u>. The Liquidating Trust shall be formed upon confirmation of this Plan. A copy of the Liquidating Trust Agreement is attached hereto as Exhibit "B" and incorporated by reference, Upon confirmation of this Plan, the Trustee of the Liquidating Trust shall be deemed to have accepted all rights and obligations provided under this Plan. In the event of any inconsistencies or conflicts between the Liquidating Trust Agreement and this Plan, the terms of this Plan shall control.

Upon the Effective Date, Susan Uecker shall be appointed Trustee of the Liquidating Trust. Any successor to the Trustee of the Liquidating Trust shall be appointed as provided in the Liquidating Trust Agreement. Ms. Uecker is not now and never has been affiliated with Aradigm, Grifols, First Eagle, Party X or Bleichroeder.

The Trustee of the Liquidating Trust shall be entitled to sell any asset of the estate without further order of the Court, except that the Trustee shall not sell or compromise the right to receive the Milestone Payments or the Royalty Payments without the consent of Bleichroeder or the approval of the Bankruptcy Court. The Trustee of the Liquidating Trust shall be further entitled to turn over collateral or leased property in return for full or partial satisfaction of claims against the estate, in her sole discretion, without further order of the Court. The Trustee of the Liquidating Trust shall be further entitled to abandon any asset of the estate if she determines that such asset is burdensome to the estate or of inconsequential value and benefit to the estate, without further order of the Court.

(b)    <u>Assets Transferred to Liquidating Trust; Tax Treatment</u>. Upon the Effective Date, all assets of the estate (of every kind, wherever located and by whomever possessed) shall be transferred to, and all title and interest shall vest in, the Liquidating Trust, without further action by Aradigm, the Trustee of the Liquidating Trust or order of the Court. For federal income tax purposes, all parties (including, without limitation, Aradigm, the Trustee of the Liquidating Trust and the holders of unsecured claims allowed either before or after the Effective Date of the Plan) shall treat said transfer as a transfer to the holders of allowed Class 2 claims and, after payment in

JMBM | Jeffer Mangels
Butler & Mitchell LLP

full of allowed Class 2 claims, plus interest, to holders of allowed Class 3 interests; said holders shall be deemed to have transferred said assets to the Trust; said holders shall be deemed to have received a beneficial interest in the Trust, as provided above, in exchange for their transfer to the Trust of said assets; and said holders shall be deemed to be the trustors of the Trust. To the extent that transfers of beneficial interests in the Liquidating Trust in exchange for allowed claims are deemed an offer or sale of securities, such transfers shall be exempt from Section 5 of the Securities Act of 1933 and any state or local law requiring registration for offer of sale of a security or registration or licensing of an issuer of, underwriter or, or broker or dealer in securities pursuant to Bankruptcy Code Section 1145(a). Holders of Class 2 claims and holders of Class 3 interests should consult their tax adviser regarding the effect of the formation of the Liquidating Trust.

(c)     Compensation of Trustee and Professionals. The Trustee of the Liquidating Trust shall be paid reasonable compensation on an hourly basis and reimbursement of expenses. The Trustee of the Liquidating Trust shall bill her time in increments of 1/10th of an hour. The compensation and reimbursement of the Trustee of the Liquidating Trust shall be entitled to administrative expense priority and shall be paid by the Trust without further order of the Court.

No more than once per calendar year, commencing on the date of confirmation of this Plan, the Trustee of the Liquidating Trust may increase the Trustee's compensation upon ten (10) calendar days' notice served by mail upon Bleichroeder, without further order of the Court. In the event that a party in interest objects to the proposed increase in compensation, the parties shall seek to resolve the dispute without the intervention of the Court. If the parties are unable to resolve their dispute within ten (10) calendar days after the objection is made, any party may file a motion to have the Court resolve the dispute.

The Trustee of the Liquidating Trust shall be authorized to employ and pay any professionals and employees, including attorneys, accountants, brokers, associates and administrative staff, as the Trustee deems reasonably necessary to assist in the performance of the Trustee's duties, without further order of the Court. The Trustee of the Liquidating Trust and the Trustee's professionals and employees shall bill their time in increments of 1/10th of an hour, with

67987881v2

Case: 19-40363   Doc# 235   Filed: 06/08/20   Entered: 06/08/20 14:01:38   Page 22 of 38

DEBTOR'S MODIFIED COMBINED CHAPTER 11 PLAN AND DISCLOSURE STMNT (DTD JUNE 8, 2020)

JMBM | Jeffer Mangels Butler & Mitchell LLP

the exception of professionals working for a commission or contingency fee, which compensation shall be limited to a reasonable commission or fee. The compensation and reimbursement of expenses of professionals and employees of the Trustee of the Liquidating Trust shall have administrative expense priority and shall be paid by the Trust without further order of the Court. The Trustee of the Liquidating Trust shall send her billing statements and those of any professionals employed by the Trustee to Bleichroeder prior to payment.

(d)    <u>Liquidation of Assets; Distributions</u>. The Trustee of the Liquidating Trust will use the cash contributed to the Liquidating Trust on the Effective Date to pay allowed administrative claims (to the extent not previously paid) and to pay allowed Class 1 claims. The balance of the cash shall be retained by the Trustee and used to fund the expenses of the operation of the Liquidating Trust pending the receipt of any future Milestone Payments and Royalty Payments.

Thus, the Trustee of the Liquidating Trust shall collect, liquidate or dispose of all assets of the estate. From proceeds received by the Liquidating Trust, as provided in this Plan, the Trustee of the Liquidating Trust shall: (1) first, pay administrative claims to the extent not previously paid (unless holders of such claims consent to other treatment); (2) second, pay allowed class 1 claims, (3) third, pay allowed class 2 claims; and (4) fourth, pay allowed class 3 interests. The Trustee of the Liquidating Trust shall endeavor to make distributions to holders of allowed class 2 claims and allowed class 3 interests as promptly as reasonably possible. The Trustee of the Liquidating Trust shall make interim distributions to holders of allowed class 2 claims and, after allowed class 2 claims are paid in full with interest, to holders of allowed class 3 interests as and when the Trustee has determined, in the exercise of the Trustee's sole discretion, that the Trustee has collected sufficient funds to justify the cost and expense of making such distributions. The Trustee of the Liquidating Trust shall be entitled to withhold from such distribution any and all amounts that the Trustee determines are required to be withheld by any law, regulation, rule, ruling, order, directive or other governmental requirement.

/ / /

/ / /

/ / /

JMBM | Jeffer Mangels Butler & Mitchell LLP

67987881v2

DEBTOR'S MODIFIED COMBINED CHAPTER 11 PLAN AND DISCLOSURE STMNT (DTD JUNE 8, 2020)

(e)      <u>Transfers Subject to Applicable Non-Bankruptcy Laws</u>. Pursuant to Bankruptcy Code Section 1129(a)(16), all transfers of property under this Plan shall be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

(f)      <u>Termination of Liquidating Trust</u>. The Liquidating Trust shall terminate after liquidation, administration and distribution of its assets in accordance with this Plan and the Liquidating Trust Agreement. The Trustee of the Liquidating Trust shall be entitled to take all steps necessary to terminate the Trust without further order of the Court. Termination of the Liquidating Trust shall occur no later than the fifth (5th) anniversary of the Effective Date of this Plan, unless extended by order of the Court.

(g)      <u>*De Minimis* Distribution; Rounding</u>. No distribution of less than $10 shall be made by the Trustee of the Liquidating Trust to any holder of a beneficial interest in the Trust, and any amounts less than said amount shall be cumulated and distributed with the subsequent distribution. The Trustee of the Liquidating Trust shall be entitled to waive said minimum as to a particular distribution if a request therefor is made in writing within thirty (30) calendar days after such distribution. Notwithstanding the foregoing, a payment of less than $10 shall be made if it is the only payment, or the final payment, that will be made on account of a beneficial interest in the Liquidating Trust. The Trustee of the Liquidating Trust shall be entitled to round the amount of any distribution down to the nearest whole dollar.

(h)      <u>Undistributed Property</u>. If any distribution is returned to the Trustee of the Liquidating Trust, no further distributions shall be made to the holder of the beneficial interest in the Trust on account of whom such distribution was made unless the Trustee is notified in writing of such holder's current address. Any returned distribution shall be held for the benefit of such holder for thirty (30) calendar days, following which such holder shall be deemed to have waived, and shall not be entitled to, said distribution, and said distribution shall become a general asset of the Liquidating Trust to be distributed in accordance with this Plan. Nothing in this Plan shall require the Trustee of the Liquidating Trust to attempt to locate any holder of such interests.

/ / /

67987881v2

JMBM | Jeffer Mangels Butler & Mitchell LLP

Any property that remains undeliverable to the holders of beneficial interests in the Liquidating Trust as of the ninetieth (90th) calendar day following liquidation or disposition of substantially all of the assets of the Trust, or upon the fifth (5th) anniversary of the Effective Date of this Plan (unless extended by order of the Court) if substantially all assets of the Trust have been liquidated or disposed of, shall be distributed to other holders of such interests in accordance with this Plan, notwithstanding any federal or state escheat laws to the contrary. Thereafter, if the Liquidating Trust possesses funds or assets not duly claimed, or if it would not be cost effective to make a final distribution, such property shall be donated to a public charity that is tax exempt under Internal Revenue Code Section 501(c)(3) of the choosing of the Liquidating Trustee.

(i)     Closing and Reopening Bankruptcy Case. In order to reduce US Trustee fees and other administrative expenses of the Liquidating Trust, the Liquidating Trustee is authorized to seek to close the Bankruptcy Case after paying administrative claims and making the distribution to holders of Class 1 claims. The Liquidating Trustee is authorized to seek to reopen the Bankruptcy Case to seek to extend the term of the Liquidating Trust, to object to claims, or for other cause. In the event the Bankruptcy Case is reopened, and continuing until the Bankruptcy Case is closed, (x) the Liquidating Trust will be subject to US Trustee fees commencing with the date of entry or the order reopening the Bankruptcy Case, and (y) the Trustee of the Liquidating Trust shall file with the Bankruptcy Court and serve upon Bleichroeder the Quarterly Post-Confirmation Reports required by Section 7.2 of the Guidelines of the Office of the United States Trustee.

(j)     Reports to Beneficiaries. The Trustee of the Liquidating Trust shall be subject to the oversight of Bleichroeder. So long as the Bankruptcy Case remains open, the Trustee of the Liquidating Trust shall file with the Bankruptcy Court and serve upon Bleichroeder the Quarterly Post-Confirmation Reports required by Section 7.2 of the Guidelines of the Office of the United States Trustee. After the Bankruptcy Case is closed, for so long as the Liquidating Trust shall remain in existence, the Trustee of the Liquidating Trust shall prepare and send Bleichroeder an annual report of the cash receipts and disbursements of the Trust. The Trustee of the Liquidating Trust shall send the information requested by holders of allowed claims and interests as provided

Jeffer Mangels
Butler & Mitchell LLP

JMBM

67987881v2

1 in Section 3.4 of the Liquidating Trust Agreement.

2      (k)    <u>Provisions Concerning the Senior Notes</u>.

3      U.S. Bank National Association is the indenture trustee (the "Indenture Trustee") for the

4 9.0% Convertible Senior Notes due 2021 (the "Senior Notes"), and acts for the holders and

5 beneficial owners of the Senior Notes (the "Senior Noteholders"). The Senior Notes were issued

6 pursuant to that certain Indenture, dated as of April 25, 2016, between Aradigm, as issuer, and the

7 Indenture Trustee (as has been, and may be further be, amended or supplemented from time to

8 time, the "Indenture"). The Senior Notes are unsecured obligations of Aradigm and are included in

9 Class 2 General Unsecured Claims (the "Senior Notes Claims"). The holders of the Senior Notes

10 are Grifols, Grifols Worldwide Operations Limited, First Eagle Value in Biotechnology Master

11 Fund, Ltd., 21 April Fund, Ltd., and 21 April Fund, L.P. As described above, Grifols and Grifols

12 Worldwide Operations Limited waived their rights to distributions with respect to their Senior

13 Note Claims. For the avoidance of doubt, and notwithstanding such waiver, the Indenture

14 Trustee's claim on account of the Senior Notes may only be modified or amended in accordance

15 with the Indenture.

16      Notwithstanding anything to the contrary in the Plan, the Indenture shall continue in effect

17 following the Effective Date solely to the extent necessary to (i) allow the holders of Senior Note

18 Claims to receive distributions under the Plan, (ii) allow the Liquidating Trustee and the Indenture

19 Trustee to make post-Effective Date Distributions or take such other action pursuant to the Plan on

20 account of the Senior Note Claims and to otherwise exercise their rights and discharge their

21 obligations related to the interests of the holders of such Senior Notes Claims in accordance with

22 the Plan, (iii) allow the Indenture Trustee to enforce any obligations owed thereto under the Plan

23 (including, without limitation, seeking compensation and reimbursement for any reasonable and

24 documented fees and expenses solely and exclusively pursuant to the charging lien provided by

25 Section 7.06 of the Indenture (the "Charging Lien")) and allow the Indenture Trustee to maintain

26 any right of indemnification, contribution, subrogation or any other Claim it may have under the

27 Indenture, (iv) permit the Indenture Trustee to perform any function necessary to effectuate the

28 foregoing, and (v) permit the Indenture Trustee to appear in the Bankruptcy Case or in any

JMBM | Jeffer Mangels Butler & Mitchell LLP

proceeding in the Bankruptcy Court or any other court relating to the Indenture, *provided that* nothing in this Part 7.k shall affect the discharge of Claims pursuant to the Bankruptcy Code or the Confirmation Order. For the avoidance of any doubt, the Indenture Trustee shall be entitled to assert its Charging Lien arising under and in accordance with the Indenture and any ancillary document, instrument, or agreement to obtain payment of its fees and expenses as set forth in Section 7.06 of the Indenture (the "Trustee Fees and Expenses") and nothing in this plan shall prejudice the Indenture Trustee's right to receive payment of the Trustee Fees and Expenses consistent with the Indenture, provided that the Indenture Trustee's sole and exclusive right to payment for the Trustee Fees and Expenses shall be to assert its Charging Lien.

As described above, Grifols and Grifols Worldwide Operations Limited waived their rights to recovery with respect to their Senior Note Claims. As a result, for all purposes under the Plan, including for purposes of receiving distributions under the Plan on account of all claims based on the Senior Notes and the Indenture, including Claim No. 23 filed by the Indenture Trustee for the outstanding amount due on the Senior Notes and Claim Nos. 24, 25, and 26 filed by First Eagle Value In Biotechnology Master Fund, Ltd., 21 April Fund, Ltd., and 21 April Fund LP, with respect to its Senior Note Claims, the Debtor and the Liquidating Trustee are entitled to calculate all remaining claims based on the Senior Notes and the Indenture, including Claim Nos. 23, 24, 25, and 26, in the aggregate amount of $4,492,922 (as set forth in Claim Nos. 24, 25, and 26, with respect to each of the Noteholders as set forth therein). Claim No. 23 shall not be subject to any objection, further reduction, counterclaim, offset, recharacterization, subordination, recoupment or other defense or challenge and shall be substituted for all claims of individual holders of Senior Notes and all claims of the individual holders of the Senior Notes (including Claim Nos. 24, 25, and 26) shall not be entitled to direct distribution. On the Effective Date, all claims of individual holders of Senior Notes shall be settled and compromised in exchange for the distribution to the Indenture Trustee of the amounts due to the beneficial holders of Senior Notes under the Plan calculated as provided herein, subject to the right of the Indenture Trustee to assert its Charging Liens against all distributions.

/ / /

JMBM | Jeffer Mangels Butler & Mitchell LLP

Except as to (i) the agreements, promises, settlements, reservations, representations, claims allowances and warranties expressly set forth in the Plan, and (ii) the performance of the obligations set forth in the Plan, the Debtor, Indenture Trustee, First Eagle Value In Biotechnology Master Fund, Ltd., 21 April Fund, Ltd., and 21 April Fund LP, and Grifols ("Parties"), on behalf of themselves and their respective successors and assigns, agree and covenant not to sue, and fully and forever release, discharge and acquit each of the other Parties, and their respective parents, subsidiaries and affiliates, and each of their respective successors, assigns, officers, directors, members, partners, employees, agents, representatives, consultants, financial advisors, accountants and attorneys, from any and all manners of claims, actions, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses, and other claims of every kind, nature, and character whatsoever existing as of the date hereof, whether at law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulation, tort (excluding intentional torts, fraud, recklessness, gross negligence or willful misconduct) or otherwise, accrued or unaccrued, known or unknown, matured or unmatured, liquidated or unliquidated, certain or contingent, including, based in whole or in part on any act, omission, transaction, event or other circumstance in any way arising from, relating to the calculation of the remaining claims based on the Senior Notes and the Indenture, including Claim Nos. 23, 24, 25, and 26.

Except for the foregoing, on and after the Effective Date, all duties and responsibilities of the Indenture Trustee shall be fully discharged (i) unless otherwise specifically set forth in or provided for under the Plan or the Confirmation Order, and (ii) except with respect to such other rights of the Indenture Trustee that, pursuant to the Indenture, survive termination of the Indenture. Subsequent to the performance by the Indenture Trustee of its obligations pursuant to the Plan and Confirmation Order, the Indenture Trustee and its agents shall be relieved of all further duties and responsibilities related to the Indenture. Any fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date solely in connection with the implementation of the Plan, including, but not limited to, making distributions pursuant to and in accordance with the Plan, are expressly subject to the

JMBM | Jeffer Mangels Butler & Mitchell LLP

Trustee's Charging Lien and its right to seek payment under the Indenture, provided that the Indenture Trustee's sole and exclusive right to seek payment for any such fees and expenses shall be to assert its Charging Lien.

Distributions on account of the allowed Senior Notes Claims, shall be made by the Liquidating Trustee to the Indenture Trustee. The Indenture Trustee, in its capacity as disbursing agent under the Indenture, shall administer the distributions in accordance with the Plan and the Indenture and be entitled to assert its Charging Lien over any such distributions. For the avoidance of doubt, nothing herein shall be deemed to impair, waive or extinguish any rights of the Indenture Trustee with respect to its Charging Lien.

The Indenture Trustee, acting as disbursing agent, shall only be required to act and make distributions in accordance with the terms of the Plan and the Indenture and shall have no (i) liability for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan, or (ii) obligation or liability for distributions under the Plan to any party who does not hold a Claim against Aradigm or who does not otherwise comply with the terms of the Plan. Upon final administration of the distributions made to the Indenture Trustee in accordance with the Plan and the Indenture, the Indenture Trustee shall be discharged from any further responsibility under this Plan.

## PART 8
## LIQUIDATION ANALYSIS

The following liquidation analysis compares the amounts Aradigm estimates general unsecured creditors will receive pursuant to the Plan with the amounts said creditors are likely to receive in a hypothetical liquidation under Chapter 7 of the Bankruptcy Code. The assets and liabilities described below are estimated for the purposes of this analysis only and shall not be binding.

/ / /

/ / /

/ / /

/ / /

JMBM | Jeffer Mangels Butler & Mitchell LLP

Aradigm Corporation
Liquidation Analysis
Based on June 15, 2020 Effective Date

| Asset | Estimated Plan Value as of Effective Date (6/15)[1] | | Liquidation Value as of Effective Date (6/15)[2] | |
|---|---|---|---|---|
| Assets | Low | High | Low | High |
| Cash and Cash Equivalents [3] | $1,100,000 | $1,100,000 | $1,100,000 | $1,100,000 |
| NIH Receivable [4] | $0 | $71,177 | $0 | $71,177 |
| Milestone Payments and Royalty Payments [5] | $0 | $25,187,000 | $0 | $25,187,000 |
| Total Assets | $1,100,000 | $26,258,177 | $1,100,000 | $26,258,177 |
| | | | | |
| Liabilities | Estimated Amount | | Estimated Amount | |
| Administrative Expenses | Low | High | Low | High |
| Chapter 7 Trustee Fees [6] | N/A | N/A | $56,250 | $810,995 |
| Chapter 7 Trustee Professional Fees [6] | N/A | N/A | $200,000 | $350,000 |
| Chapter 11 Administrative Expenses [7] | $519,217 | $519,217 | $519,217 | $519,217 |
| Liquidating Trustee Fees and Professional Fees [8] | $100,000 | $250,000 | N/A | N/A |
| Liquidating Trustee Professional Fees [9] | $100,000 | $250,000 | | |
| Total Administrative Expenses | $719,217 | $1,019,217 | $775,467 | $1,680,212 |
| Funds Remaining For Creditors | $380,783 | 25,238,960 | $324,533 | $24,577,965 |
| Class 1: Priority Claims [10] | $154,200.00 | | $154,200.00 | |
| Class 2: General Unsecured Claims [11] | 6,966,286 | | $6,966,286 | |
| | | | | |
| Percentage Recovery for General Unsecured Claims | 3.25% | 100% | 2.4% | 100% |
| Funds Available to Shareholders | 0 | $18,118,474 | 0 | $17,457,480 |

**Liquidation Analysis Footnotes:**

[1]  Estimated values prepared by the Debtor. Assumes a June 15, 2020 Effective Date for the Plan.

[2]  Estimated values prepared by the Debtor. Assumes a June 15, 2020 Effective Date for the Plan.

[3]  This is the Debtor's projected cash on hand as of June 15, 2020.

[4]  This is a receivable due Aradigm by the National Institute of Health, net of cure payments to be made from these funds.

[5]  Milestone Payments consists of the Debtor's right to receive $3 million pursuant to the APA with Grifols. Royalty

JMBM | Jeffer Mangels Butler & Mitchell LLP

67987881v2

Payments consist of the Debtor's right to receive royalty payments on the sales of the Aradigm product pursuant to the APA with Grifols. The estimated values are described in Part 2.C.3 of the Plan

[6]   Chapter 7 Trustee fees are calculated as provided in 11 U.S.C. § 326(a) and Chapter 7 Counsel fees are an estimate by the Debtor.

[7]   Professional fees are described in detail in Part 4 of the Plan.

[8]   This is an estimate provided by the proposed Liquidating Trustee of the Liquidating Trustee's fees for the six years after the Effective Date.

[9]   This is an estimate of the Liquidating Trustee's professional fees for legal and accounting services for the six years after the Effective Date.

[10] Priority claims consist of amounts due to the Debtor's former employees. There is a filed priority tax claim in the amount of $10,440.43, but such claim was satisfied pre-petition.

[11] This is from the Debtor's schedules and the filed proofs of claim. This figure excludes the filed claims of Grifols and Exelead.

## PART 9
## VOTING

(a)    <u>Who May Vote</u>. The Bankruptcy Court fixed the record date for voting as April 24, 2020. Holders of allowed claims in class 1 or class 2 and holders of allowed interests in class 3, in each case as of the record date, are entitled to vote on confirmation of the Plan unless an objection or adversary proceeding has been filed with respect to that creditor's or interest holder's claim. A creditor whose claim has been objected to and who wishes to vote must move to have its claim allowed for voting purposes by filing a motion for such relief in time for that motion to be heard at or before the confirmation meeting.

(b)    <u>How to Vote</u>. All ballots must be received by Aradigm's counsel on or before 5:00 pm San Francisco time on June 1, 2020. Ballots must be delivered by mail, overnight delivery or email and addressed as follows:

Jeffer Mangels Butler & Mitchell LLP
Two Embarcadero Center, Suite 500
San Francisco, CA 94111
Attention: Bennett G. Young
byoung@jmbm.com

(c)    <u>Effect of Vote</u>. The Plan will be confirmed only if it is accepted by each impaired class, or if it is accepted by at least one impaired class (exclusive of insiders) and the court determines it is fair and equitable to all dissenting classes. A class of creditors accepts the Plan if it is accepted by a majority in number and two-thirds in dollar amount of creditors who cast ballots.

67987881v2

JMBM | Jeffer Mangels Butler & Mitchell LLP

A class of interests accepts the Plan if it is accepted by two-thirds in dollar amount of interest holders who cast ballots. Aradigm reserves the right to seek confirmation of the Plan notwithstanding the rejection of the Plan by one or more classes of creditors pursuant to Bankruptcy Code Section 1129(b).

## PART 10
## TRANSFERS NOT SUBJECT TO TAX

Pursuant to Bankruptcy Code Section 1146, the execution, delivery, or recording of an instrument of transfer pursuant to, in implementation of, or as contemplated by this Plan, including, without limitation, any transfers to or by the Liquidating Trust or the Trustee of the Liquidating Trust, shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument may be recorded hereunder shall, pursuant to the order confirming the Plan, be ordered and directed to accept such instrument without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

## PART 11
## EFFECT OF CONFIRMATION

(a)     Dissolution of Aradigm. Upon the Effective Date, Aradigm shall be deemed to have been wound up and dissolved. The Trustee of the Liquidating Trust shall be entitled to take all steps necessary on behalf of Aradigm to effectuate such dissolution. Upon the Effective Date of this Plan, the Responsible Individual and all acting officers, directors, employees, consultants, and professionals of Aradigm shall be discharged from such capacities.

(b)     Vesting of Property. Upon confirmation of the Plan, all property of the estate shall vest in the Liquidating Trust free and clear of all claims and interests, except as provided in this Plan, pursuant to Bankruptcy Code Section 1141.

(c)     Plan Creates New Obligations. The obligations that are provided in the confirmed Plan replace those obligations of Aradigm to creditors or shareholders that existed prior to the Effective Date of the Plan. The obligations under the confirmed Plan constitute binding

JMBM | Jeffer Mangels
Butler & Mitchell LLP

67987881v2

contractual promises that, if not satisfied through performance of the Plan, create a basis for an action for breach of contract under California law. To the extent a creditor retains a lien under the Plan; that creditor retains all rights provided by such lien under applicable non-bankruptcy law, subject to the provisions hereof. The Liquidating Trust shall not have any liability to any creditors or other parties in interest other than to administer the assets that vest in the Liquidating Trust on and after the Effective Date and make the distributions expressly provided for in this Plan.

(d)     <u>Creditor Action Restrained</u>. The confirmed Plan is binding on every creditor and shareholder whose claims or interests are provided for in this Plan, whether or not such creditor or shareholder votes to accept this Plan, and a creditor or shareholder may not take any action to enforce any pre-confirmation obligation except as provided in this Plan.

(e)     <u>Effect of Conversion to Chapter 7</u>. If the case is at any time converted to one under Chapter 7: (i) all property of the estate as of the date of conversion, whether acquired pre-confirmation or post-confirmation, shall vest in the Chapter 7 bankruptcy estate; and (ii) all creditors, whether their claims arose pre-confirmation or post-confirmation, shall be prohibited from taking action against the Chapter 7 bankruptcy estate or property of the estate by Bankruptcy Code Section 362(a).

## PART 12
## CLAIMS RESERVED

The Trustee of the Liquidating Trust shall succeed to all of Aradigm's or the bankruptcy estate's rights against any third parties and all interests in any real or personal property, wherever located and by whomever possessed, whether arising from bankruptcy or non-bankruptcy law, including the following: causes of action; claims; counterclaims; defenses; rights of offset or recoupment; privileges; licenses; powers, rights and entitlements arising under contract, law or equity; objections to claims; objections to the validity, priority, amount, allowance or classification of any claim; rights to seek equitable or contractual subordination of claims; rights to avoid and recover prepetition or postpetition transfers (including but not limited to those arising under Bankruptcy Code Section 542, 543, 544, 545, 546, 547, 548, 549, 550, 551 and 553); claims related to taxes; rights to file tax returns and amended returns; rights to seek tax determinations,

JMBM | Jeffer Mangels Butler & Mitchell LLP

including, without limitation, tax loss carryback claims, net operating loss claims, determinations of basis or depreciation, overpayment claims, offset and counterclaims; claims, causes of action and defenses against or with respect to financial institutions and any other person for the turnover of funds of, or due to, the estate; and claims, causes of action and defenses for coverage in or under any and all insurance policies of Aradigm, under which Aradigm is a beneficiary or against which Aradigm holds a claim (collectively, the "Reserved Claims").

Aradigm believes that there are not significant claims to avoid and recover prepetition transfers. As set forth in its Schedule of Financial Affairs, Aradigm made payments to its vendors during the 90 days prior to the Petition Date. In most case, those payments were made on a current basis in the ordinary course of Aradigm's business or the recipients extended new credit to Aradigm after the payment was made, which likely would provide a defense to any claims to recover the payments. Also as set forth in its Schedule of Financial Affairs, Aradigm made payments during the 90 days prior to the Petition Date to its employees for performance bonuses, retention bonuses, accrued vacation pay, and severance pay. These payments were made in the ordinary course of Aradigm's business. Furthermore, certain of the payments were required to be made by state employment law.

**PART 13**
**RETENTION OF JURISDICTION**

The Court shall retain jurisdiction: (a) to determine whether Aradigm has defaulted in performance of any obligation under this Plan; (b) to determine whether the time for performing any obligation should be extended; (c) to determine whether the case should be converted to one under Chapter 7, and proceedings following any such conversion; (d) to estimate the amount of any claim, to determine any and all objections to the validity, priority, amount or allowance of claims and to determine any motion, action or adversary proceeding concerning the classification or subordination of claims; (e) to determine the validity, priority, and amount of administrative priority claims, and any and all applications for allowance of compensation or reimbursement of expenses and any other fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code, this Plan or the Liquidating Trust Agreement; (f) to determine any and all

JMBM | Jeffer Mangels Butler & Mitchell LLP

applications, motions, adversary proceedings, and contested or litigated matters arising in or related to the within case, whether pending before the Court on the date of confirmation or not, including, without limitation, avoidance actions under the Bankruptcy Code and other applicable law; (g) over any actions pertaining to any Reserved Claims; (h) to determine the extent, validity, priority or amount of any lien asserted against property of the estate; (i) to determine matters related to the collection, liquidation, realization upon and enforcement of rights regarding property of the estate or the Liquidating Trust; (j) to resolve any motion of the Trustee of the Liquidating Trust seeking instruction or approval of any matter affecting the administration of the Liquidating Trust; (k) to enforce, interpret, and modify the Plan, any agreement made under the Plan, or the order confirming the Plan; (l) to remedy any defect or omission, or to reconcile any inconsistency in the Plan, the order confirming the Plan or any other order of the Court; (m) to determine all controversies, suits, and disputes that may arise in connection with the interpretation, enforcement, implementation, consummation, or administration of the Plan or the order confirming the Plan; (n) to enter a final decree closing the within case and to reopen the Bankruptcy Case; (o) to determine such other matters as may arise in connection with the Plan or the order confirming the Plan and to issue orders regarding, and in furtherance of, execution and consummation of the Plan, the Liquidating Trust, and the order confirming the Plan; (p) to determine, as is necessary or appropriate under Bankruptcy Code Section 505 or otherwise, matters relating to tax returns filed or to be filed on behalf of the estate or the Liquidating Trust for all periods through the end of the fiscal year in which the within case is closed; (q) to hear and determine any disputes regarding assets of the estate or the Liquidating Trust, wherever located; (r) to hear and determine any disputes regarding the Liquidating Trust or the Trustee of the Liquidating Trust, and to authorize the Trustee of the Liquidating Trust to take actions consistent with the Plan or the order confirming the Plan; (s) to authorize and approve, or disapprove, any settlements or compromises of claims, causes of action, defenses, or controversies asserted by or against the estate, and the sale, lease or other disposition of property of the estate; (t) to enter orders confirming the appointment of a successor to or replacement of the Trustee of the Liquidating Trust; (u) to enter such orders as may be appropriate in the event the order confirming the Plan is for any reason

JMBM | Jeffer Mangels Butler & Mitchell LLP

stayed, revoked, modified, rescinded or vacated; (v) to determine motions for the rejection; assumption, or assignment of executory contracts or unexpired leases filed before the Effective Date of the Plan and the allowance of any claims resulting therefrom; and (w) to issue and enforce injunctions, make determinations of declaratory relief, or take such other legal or equitable actions or issue such other orders as maybe necessary or appropriate to restrain interference with the Plan, the order confirming the Plan, any sale or other action provided under the Plan, the estate, the Liquidating Trust, the Trustee of the Liquidating Trust and any professional employed by Aradigm or the Trustee of the Liquidating Trust.

**PART 14**
**GENERAL PROVISIONS**

(a)     <u>Effective Date of Plan</u>. The effective date of the Plan shall be the first business day that is fourteen (14) days after the date of the entry of the order of confirmation, if no notice of appeal from that order has been filed (the "Effective Date"). If a notice of appeal has been filed, Aradigm may waive the finality requirement and put the plan into effect, unless the order confirming the Plan has been stayed. If a stay of the confirmation order has been issued, the Effective Date shall be the first business day after that date on which no stay of the confirmation order is in effect, provided that the confirmation order has not been vacated.

(b)     <u>Plan Term</u>. The term of this Plan shall be five years from the Effective Date of this Plan, unless extended by order of the Court. Aradigm anticipates that if FDA and/or EMA approval is obtained and the milestone payments earned, the Liquidating Trustee will seek to extend the term of the Plan and the Liquidating Trust for the ten year duration of the royalty term.

(c)     <u>Cramdown</u>. Pursuant to Bankruptcy Code Section 1129(b), Aradigm reserves the right to seek confirmation of the Plan notwithstanding the rejection of the Plan by one or more classes of creditors.

(d)     <u>Severability</u>. If any provision in the Plan is determined to be unenforceable, the determination shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

/ / /

67987881v2

(e) <u>Amendment</u>. This Plan may be altered, amended or modified by Aradigm before or after confirmation in the manner provided under Bankruptcy Code Section 1127. A holder of a claim that has accepted or rejected the Plan shall be deemed to have accepted or rejected, as the case may be, the Plan as altered, amended or modified, unless within the time fixed by the Court, such holder changes its previous acceptance or rejection by written notice served upon Aradigm.

(f) <u>Binding Effect</u>. The provisions of this Plan shall bind Aradigm, the Liquidating Trust, the Trustee of the Liquidating Trust, any person asserting a claim against or interest in Aradigm, the Liquidating Trust and any of the assets of the estate or the Liquidating Trust, whether or not the claim or interest is impaired under this Plan, whether or not the claim or interest is allowed, and whether or not the holder has accepted the Plan. The rights and obligations of any entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of the successors or assigns of such entity, including any chapter 7 or chapter 11 trustee.

(g) <u>Captions</u>. The heading contained in the Plan are for convenience of reference only and do not affect the meaning or interpretation of the Plan.

(h) <u>Controlling Effect</u>. Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of California govern the Plan and any agreements, documents, and instruments executed in connection with the Plan, except as otherwise provided in' the Plan.

(i) <u>Notices</u>. Any notice to Aradigm shall be in writing and mailed, and shall be deemed to have been given three days after the date sent by first class mail, postage prepaid and addressed as follows:

> Aradigm Corporation
> c/o Jeffer Mangels Butler & Mitchell LLP
> Two Embarcadero Center, Suite 500
> San Francisco, CA 94111
> Attention: Bennett G. Young

Any notice to the Trustee of the Liquidating Trust shall be in writing and mailed, and shall be deemed to have been given three days after the date sent by first class mail, postage prepaid and addressed as follows:

/ / /

JMBM | Jeffer Mangels Butler & Mitchell LLP

67987881v2

Aradigm Corporation Liquidating Trust
c/o Susan L. Uecker, Liquidating Trustee
Uecker & Associates, Inc.
1613 Lyon Street, Suite A
San Francisco, Ca 94115

(j)   <u>No Waiver of Claims</u>. Confirmation of this Plan effects no settlement, compromise, waiver or release of any claim or cause of action unless specifically provided in this Plan or the order confirming this Plan. The nondisclosure of any particular claim or cause of action, including, but not limited to, any of the Litigation Claims, shall not be construed as a settlement, compromise, waiver or release of such claims or cause of action.

DATED:  June 8, 2020                           JEFFER MANGELS BUTLER & MITCHELL LLP
                                                            BENNETT G. YOUNG, ESQ.



                                                            By:   /s/ Bennett G. Young
                                                                         BENNETT G. YOUNG
                                                            Attorney for ARADIGM CORPORATION
                                                            Debtor and Debtor-in-Possession

JMBM  Jeffer Mangels
Butler & Mitchell LLP

67987881v2

DEBTOR'S MODIFIED COMBINED CHAPTER 11 PLAN AND DISCLOSURE STMNT (DTD JUNE 8, 2020)