

1    JEFFER MANGELS BUTLER & MITCHELL LLP
     BENNETT G. YOUNG (Bar No. 106504)
2    *byoung@jmbm.com*
     Two Embarcadero Center, 5th Floor
3    San Francisco, California 94111-3813
     Telephone:    (415) 398-8080
4    Facsimile:     (415) 398-5584

5    Attorney for
     ARADIGM CORPORATION
6    Debtor and Debtor-in-Possession

**The following constitutes the order of the Court.**
**Signed: June 12, 2020**

*[signature]*

**William J. Lafferty, III**
**U.S. Bankruptcy Judge**

7

8            UNITED STATES BANKRUPTCY COURT

9       NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

10   In re

11   ARADIGM CORPORATION

    CASE NO. 19-40363 WJL

    Chapter 11

12

13

14

**ORDER CONFIRMING DEBTOR'S
MODIFIED COMBINED CHAPTER 11
PLAN OF REORGANIZATION AND
DISCLOSURE STATEMENT (DATED
JUNE 8, 2020)**

15

16

17

18

Date:        June 10, 2020
Time:       10:30 a.m. (Pacific Time)
Place:      Hearing conducted remotely
            via videoconference
Judge:      Hon. William J. Lafferty

19

20        This matter came before the Court on June 10, 2020 (the "Confirmation Hearing") on the

21   request of Aradigm Corporation, as debtor and debtor in possession (the "Debtor") in the above-

22   captioned chapter 11 case, for confirmation of the Debtor's Modified Combined Chapter 11 Plan of

23   Reorganization and Disclosure Statement (Dated June 8, 2020) (the "Modified Plan") (dkt. no. 235).

24   Bennett G. Young of Jeffer Mangels Butler & Mitchell, LLP appeared on behalf of the Debtor;

25   other appearances are noted in the record of the hearing.

26        The Court having made its findings of fact and conclusions of law as provided in Federal

27   Rule of Civil Procedure 52(a), made applicable by Federal Rules of Bankruptcy Procedure 9014 and

28   7052, and good cause appearing,

68010308v1

1

ORDER CONFIRMING DEBTOR'S MODIFIED COMBINED CHAPTER 11 PLAN OF REORGANIZATION AND
DISCLOSURE STATEMENT (DATED JUNE 8 2020)

Case: 19-40363   Doc# 238   Filed: 06/12/20   Entered: 06/12/20 16:35:38   Page 1 of
64

1    IT IS HEREBY ORDERED THAT:

2        1.      The disclosure statement incorporated into the Modified Plan is approved.

3        2.      The Modified Plan, a copy of which is attached hereto as Exhibit A, is confirmed.

4        3.      The Liquidating Trust Agreement attached to the Modified Plan as Exhibit B is

5    approved.

6

7                                   ***END OF ORDER***

8

9    APPROVED AS TO FORM:

10   DATED:  June 11, 2020                    SQUIRE PATTON BOGGS (US) LLP

11

12                                            By:   /s/ Jeffrey N. Rothleder

13                                            Attorneys for U.S. BANK, NATIONAL
                                              ASSOCIATION, in its capacity as Indenture Trustee
14

15   DATED:  June 11, 2020                    ARENT FOX LLP

16

17                                            By:   /s/ Aram Ordubegian
                                                    ARAM ORDUBEGIAN
18                                            Attorneys for GRIFOLS, S.A. and GRIFOLS
                                              WORLDWIDE OPERATIONS LIMITED
19

20   DATED:  June 11, 2020                    TRODELLA & LAPPING LLP

21

22                                            By:   /s/ Richard Lapping
                                                    RICHARD LAPPING
23                                            Attorneys for FIRST EAGLE VALUE IN
                                              BIOTECHNOLOGY MASTER FUND, LTD., 21
24                                            APRIL FUND, LTD., and 21 APRIL FUND LP

25

26

27

28

68010308v.1

ORDER CONFIRMING DEBTOR'S MODIFIED COMBINED CHAPTER 11 PLAN OF REORGANIZATION AND
DISCLOSURE STATEMENT (DATED JUNE 8 2020)

Case: 19-30088   Doc# 438   Filed: 06/11/20   Entered: 06/11/20 14:41:41   Page 2 of
64

**COURT SERVICE LIST**

All parties will be served via e-filing notifications

68010308v1

# EXHIBIT A

1  JEFFER MANGELS BUTLER & MITCHELL LLP
   BENNETT G. YOUNG (Bar No. 106504)
2  *byoung@jmbm.com*
   Two Embarcadero Center, 5th Floor
3  San Francisco, California 94111-3813
   Telephone:     (415) 398-8080
4  Facsimile:     (415) 398-5584

5  Attorneys for Debtor and Debtor-in-Possession
   ARADIGM CORPORATION

6

7

8              UNITED STATES BANKRUPTCY COURT

9        NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

10  In re                          Case No. 19-40363-WJL

11  ARADIGM CORPORATION,           Chapter 11

12                                 **DEBTOR'S MODIFIED COMBINED
                                   CHAPTER 11 PLAN AND DISCLOSURE
13              Debtor.            STATEMENT (DATED JUNE 8, 2020)**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JMBM | Jeffer Mangels
Butler & Mitchell LLP

**INTRODUCTION**

This Modified Combined Chapter 11 Plan and Disclosure Statement (Dated June 8, 2020) (the "Plan") provides for the distribution of the proceeds of the liquidation of the assets of Aradigm Corporation (hereinafter referred to as "Aradigm"), the debtor-in-possession in a case (the "Bankruptcy Case") pending under chapter 11 of Title 11 of the United States Code before the United States Bankruptcy Court for the Northern District of California, Oakland Division (the "Bankruptcy Court"), to Aradigm's creditors and, after creditors are paid in full with interest, to shareholders. The Plan is proposed by Aradigm. If confirmed, this Plan will bind all creditors and shareholders provided for in this Plan, whether or not they file a proof of claim or interest or accept this Plan, and whether or not their claims or interests are allowed.

You may be entitled to vote on the Plan, or to object to confirmation of the Plan or final approval of the Disclosure Statement. Ballots must be received by Aradigm's counsel on or before June 1, 2020, and objections to the Plan or Disclosure Statement must be filed with the Court, on or before June 1, 2020. A hearing on confirmation of the Plan and final approval of the Disclosure Statement will be held on June 10, 2020. Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. All creditors and shareholders should refer to Part 3 of this Plan for information regarding the precise treatment of their claims, and to Part 9 for voting instructions. No statements concerning Aradigm or its assets are authorized other than those set forth herein,

**PART 1**
**EXECUTIVE SUMMARY[1]**

The Bankruptcy Court directed Aradigm to provide this brief summary of the Plan. The purpose of this summary is to provide a quick and ready description of Aradigm, the reasons Aradigm filed the Bankruptcy Case, and of the major events that occurred in the Bankruptcy Case. This summary also describes the major decision to be made by parties in interest in voting on the

---

[1] Further detail regarding Aradigm, its capital structure and the events that lead to the filing of the Bankruptcy Case are set forth in Exhibit A.

JMBM | Jeffer Mangels Butler & Mitchell LLP

67987881v2

Plan. That decision is whether to vote to accept the Plan and implement the liquidating trust mechanism proposed by Aradigm to collect the deferred compensation to be paid by the purchaser of Aradigm's assets or to vote to reject the Plan and convert the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code. Further details are provided below and in Exhibit A attached to this Plan.

Aradigm is a publicly traded emerging specialty pharmaceutical company focused on the development and commercialization of products for the treatment and prevention of severe respiratory diseases. Aradigm's lead product candidate completed two Phase 3 trials. However, the Federal Drug Administration ("FDA") declined to approve the drug and requested that Aradigm conduct an additional Phase 3 trial. Aradigm estimated that a Phase 3 trial would cost approximately $75 million and take at least three years to complete.

Addressing the delays Aradigm experienced obtaining regulatory approval and the FDA's request for an additional Phase 3 trial would have required significant expenditures which Aradigm lacked the capital to fund. Grifols, S.A. ("Grifols"), Aradigm's principal funding partner, indicated that it was unwilling to fund the new Phase 3 trial and that it was unwilling to continue to fund Aradigm. Aradigm therefore determined that it needed to seek a buyer for its assets. Aradigm filed this chapter 11 case on February 15, 2019 (the "Petition Date") in order to conserve its cash resources and to pursue a sale of its assets.

From the outset of the Bankruptcy Case Aradigm's objective was to pursue a sale of its assets. The sales process was extremely complex as a result of the License and Collaboration Agreement (the "Grifols License") between Grifols and Aradigm. In broad terms, the Grifols License distinguishes between the right to pursue regulatory approval of Aradigm's drug candidates, Aradigm's intellectual property, and the right to manufacture the product, on the one hand, and the right to commercialize the product once approved on the other. In the Grifols License, Aradigm granted to Grifols an exclusive worldwide license to commercialize the product, in return for milestone payments and a royalty stream once the product was commercialized, while Aradigm retained ownership of the intellectual property and the exclusive right to pursue regulatory approval and to manufacture the product. Thus, Grifols controls the commercial rights

Jeffer Mangels
Butler & Mitchell LLP

JMBM

67987881v2

to the product, while Aradigm controls the development and owns the underlying intellectual property.

Due to the complexity of Aradigm's assets, the sales process was delicate and difficult. Aradigm retained EMA Partners, LLC ("EMA Partners") to act as its investment banker and to assist Aradigm in the sale process. EMA Partners conducted a robust sales process. EMA Partners identified and contacted over 50 potentially interested parties. Fourteen of these parties expressed interest and evaluated the opportunity. As a result of these efforts, there were multiple interested parties. One of these interested parties submitted a bid. This bid was subject to significant contingencies which, in Aradigm's view, made the bid unattractive.

Grifols made a proposal to Aradigm to purchase Aradigm's assets. The proposal contemplated a cash payment, additional cash payments upon the achievement of certain milestones and royalty payments based upon sales of the product. After negotiations, Aradigm determined that Grifols' proposal was the superior bid. Aradigm therefore accepted Grifols' proposal and encouraged the competing bidder to submit a higher and better bid at the auction.

The Grifols License was a significant complicating factor. Grifols advised Aradigm that Grifols simultaneously was negotiating a transaction with a third party (Party X). Aradigm understood that as a practical matter Aradigm's transaction with Grifols was contingent on the successful outcome of Grifols' negotiations with Party X.

Grifols and Aradigm signed an asset purchase agreement ("APA") on February 18, 2020. The APA provided that the sale was subject to overbids through an auction process in the Bankruptcy Court and did not impose any limitations on Aradigm's ability fully to market its assets to other interested parties.

Under the APA, Aradigm agreed to sell all of its intellectual property assets and certain other assets to Grifols. The purchase price was $3,247,000 in cash payable at closing, plus milestone payments amounting to an additional $3 million (the "Milestone Payments") and a royalty of 25% of the royalties received by Grifols during the royalty term in connection with the sale of any Aradigm Product under any definitive agreement between Grifols and any licensee for the development and commercialization of any Aradigm Product (the "Royalty Payments"). The

DEBTOR'S MODIFIED COMBINED CHAPTER 11 PLAN AND DISCLOSURE STMNT (DTD JUNE 8, 2020)

JMBM Jeffer Mangels Butler & Mitchell LLP

67987881v2

Milestone Payments are payable $2 million upon FDA approval of any Aradigm Product and $1 million upon EMA approval of any Aradigm Product. The royalty term is the shorter of 10 years after the first commercial sale of an Aradigm Product or the expiration of the last Aradigm Patent covering an Aradigm Product. In addition, Grifols and its affiliate Grifols Worldwide Operations, Limited, agreed to waive their filed proofs of claim in the Bankruptcy Case in the total amount of $31,735,898.90.

After the APA was signed, Aradigm and EMA Partners continued to market Aradigm's assets to interested parties. However, no party submitted a competing bid. Aradigm therefore cancelled the scheduled auction and requested that the Court approve the sale to Grifols on the terms set forth in the APA. On March 30, 2020 the Bankruptcy Court entered an order approving the sale. The sale closed on March 31, 2020. After repayment of the DIP Loans as described below, and payment of certain cure costs, Aradigm received net cash proceeds of $834,933.

The remainder of the consideration payable to Aradigm is in the form of the Milestone Payments and the Royalty Payments. Whether and when Aradigm will receive the Milestone Payments and the Royalty Payments is uncertain and subject to several risks. In particular:

- Aradigm understands that Grifols licensed the rights it purchased from Aradigm to Party X and that Party X will undertake the necessary clinical trials and, if those trials are successful, Party X will market and sell the drug. The possibility exists that Party X will be unable to complete the clinical trial or the trial will be unsuccessful. Aradigm is aware that Party X is currently pursuing clinical trials for certain of Party X's other assets. These other clinical trials will require a significant investment by Party X which could affect Party X's ability successfully to complete the clinical trials of the Aradigm product.

- Aradigm estimates that the process to obtain FDA and EMA approval could take up to 5 years. Moreover, there is no assurance that either or both approvals will be obtained. Whether and when US or European approval of an Aradigm product will be obtained, triggering Aradigm's right to receive the Milestone Payments, is uncertain. Thus, the Milestone Payments will likely not be received for as much as 5 years, and might not be received at all.

- The timing and amount of Royalty Payments is uncertain because it is dependent on successful marketing and sale of any resulting product which has received regulatory approval. The royalty term is the shorter of ten years after the first commercial sale of an Aradigm Product or the expiration of the last Aradigm Patent covering an Aradigm Product, meaning that the deferred consideration payable to Aradigm is payable over a period of up to 15 years.

- If neither FDA nor EMA approval is obtained, there will be no Milestone Payments, no sales of the Aradigm product and no Royalty Payments.

JMBM | Jeffer Mangels Butler & Mitchell LLP

67987881v2

Case: 19-40363    Doc# 238    Filed: 06/08/20    Entered: 06/08/20 14:06:58    Page 9 of
5
DEBTOR'S MODIFIED COMBINED CHAPTER 11 PLAN AND DISCLOSURE STMNT (DTD JUNE 8, 2020)
64

This Plan provides for the creation of a Liquidating Trust, to be administered by a Liquidating Trustee, to collect, sell or otherwise dispose of the assets of Aradigm's estate, including the contingent, deferred consideration received from the sale of Aradigm's assets, and to distribute the net proceeds to creditors and shareholders. Aradigm has no secured creditors. The Plan places all prepetition priority unsecured creditors in one class, places all general unsecured creditors in a single class and places all shareholders in a single class. The term of this Plan is five years, unless extended by order of the Court.

The Liquidating Trust will be funded by Aradigm's cash on hand. The Liquidating Trust will not receive significant additional cash, if at all, until the Milestone Payments are received in approximately 3 to 5 years. Aradigm projects that its cash will be sufficient to pay all administrative expenses on the Effective Date of the Plan, to fund payment in full of the Class 1 priority wage claims and to fund the Liquidating Trust's operations until the Milestone Payments are received. The Liquidating Trust most likely will not have significant activity unless and until the Milestone Payments are received. Furthermore, no distribution will be made to class 2 unsecured creditors unless and until the Milestone Payments are received and no distribution will be made to class 3 equity holders unless and until sufficient Milestone Payments and Royalty Payments have been received to pay class 2 unsecured creditors in full with interest.

The Trustee of the Liquidating Trust shall be subject to the oversight of Bleichroeder, L.P. ("Bleichroeder"). Bleichroeder is Aradigm's second largest shareholder, holding through the investment funds it manages approximately 26% of Aradigm's stock, and is now its largest creditor, with a claim based on notes and convertible notes of approximately $4.4 million. So long as the Bankruptcy Case remains open, the Trustee of the Liquidating Trust shall file with the Bankruptcy Court and serve upon Bleichroeder the Quarterly Post-Confirmation Reports required by Section 7.2 of the Guidelines of the Office of the United States Trustee. After the Bankruptcy Case is closed, for so long as the Liquidating Trust shall remain in existence, the Trustee of the Liquidating Trust shall prepare and send Bleichroeder an annual report of the cash receipts and disbursements of the Trust. In addition, the Trustee of the Liquidating Trust shall send the information requested by holders of allowed claims and interests as provided in Section 3.4 of the

Jeffer Mangels
Butler & Mitchell LLP

JMBM

67987881v2

Liquidating Trust Agreement. Aradigm believes that requiring the Liquidating Trustee to report only to Bleichroeder, the largest creditor and second largest shareholder, is protective of creditors and shareholders and is the most efficient and cost effective way to proceed. The Bankruptcy Court has advised that any creditor or shareholder that disagrees or objects may make its views known at the hearing to confirm the Plan on June 10, 2020.

The alternative to the Plan is to convert the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code. If this were to occur, a chapter 7 trustee would be appointed to administer Aradigm's assets, including collection of the Milestone Payments and the Royalty Payments and the distribution of the proceeds to creditors and, after creditors are paid in full, plus interest, to shareholders.

Aradigm believes that the creation of the Liquidating Trust and the appointment of a liquidating trustee is superior to conversion of the Bankruptcy Case to chapter 7 and the appointment of a chapter 7 trustee for the following reasons:

- A chapter 7 trustee is statutorily directed to close the bankruptcy estate "as expeditiously as is compatible with the best interests of parties in interest." 11 U.S.C.§ 704(a)(1). The directive to close the case expeditiously could create an incentive for the chapter 7 trustee to sell the rights to receive the future Milestone Payments and the future Royalty Payments at a discount.

- Furthermore, the statutory directive is inconsistent with the potential 15 year term for the receipt of the Milestone Payments and the Royalty Payments. Aradigm believes that a liquidating trustee is better situated to collect these payments over the potentially lengthy term.

- A liquidating trust receives favorable tax treatment compared to a chapter 7 bankruptcy estate.

- A chapter 7 trustee will be more expensive if the Milestone Payments and the Royalty Payments are received. A chapter 7 trustee is entitled to the statutory commission calculated as provided in 11 U.S.C.§ 704(a)(1) on all funds distributed by the trustee while the liquidating trustee will be paid an hourly rate. The statutory commission is a sliding scale for amounts distributed under $1 million and is three percent (3%) of all amounts over $1 million. Aradigm submits that if the Milestone Payments and the Royalty Payments are received, the chapter 7 trustee's three percent statutory commission will be higher than the hourly fee charged by the liquidating trustee.

- Finally, Aradigm believes that a liquidating trust will better protect the interests of creditors and shareholders, particularly with respect to making distributions to shareholders many years in the future if sufficient Royalty Payments to fund such payments are received.

JMBM Jeffer Mangels Butler & Mitchell LLP

67987881v2

# PART 2
## EVENTS SINCE THE FILING OF THE BANKRUPTCY CASE

### A.    <u>The Decision to File the Bankruptcy Case</u>

Addressing the delays Aradigm experienced obtaining regulatory approval and the FDA's request for an additional Phase 3 trial would have required significant expenditures by Aradigm on additional research, administrative expenses, and development and regulatory activities. Aradigm lacked the capital to fund these expenditures. Grifols, Aradigm's principal funding partner, indicated that it was unwilling to fund the new Phase 3 trial requested by the FDA. In January 2019 Grifols advised Aradigm that Grifols was unwilling to continue to fund Aradigm. Aradigm therefore determined that it needed to seek a buyer for its assets.

Aradigm recognized that its assets are complex and a sales process was likely to be lengthy. Aradigm therefore took steps to conserve its cash in order to have as much of a runway to pursue a sale as possible. A major expense coming due in February 2019 was the premium to renew Aradigm's directors' and officers' insurance policy. That policy was due to expire on February 15, 2019. The Debtor received a quote to renew the policy for an additional one year term for a premium of approximately $1.3 million, which was approximately 40% of Aradigm's cash on hand at that time.

If Aradigm did not renew the policy, the members of its board of directors likely would resign. Thus, Aradigm had the choice of purchasing the D&O policy, which would leave it with little cash and therefore limited runway to pursue a sales process for its assets, or to allow the policy to lapse, which would probably result in the resignation of the Board and the officers but would leave Aradigm with a longer runway to pursue a sale. Aradigm determined that it was not in the best interests of its creditors and shareholders to purchase the D&O policy and therefore allowed the policy to expire. As expected, Aradigm's Board, after authorizing the filing of a chapter 11 case, resigned, as did Aradigm's officers. Aradigm filed this chapter 11 case on the Petition Date in order to conserve its cash resources and to pursue a sale of its assets.

/ / /

/ / /

67987881v2

DEBTOR'S MODIFIED COMBINED CHAPTER 11 PLAN AND DISCLOSURE STMNT (DTD JUNE 8, 2020)

**B.** **Aradigm Files the Bankruptcy Case and Commences A Process to Market and Sell its Assets to the Highest Bidder**

On the Petition Date Aradigm commenced a voluntary case under chapter 11 of the Bankruptcy Code. Aradigm continues to operate its business and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Bankruptcy Case. No official committees have been appointed.

From the outset Aradigm's objective was to pursue a sale of its assets. Due to the complexity of Aradigm's assets, the sales process was delicate and difficult. After the Petition Date, Aradigm explored selling its assets without using an investment banker. Grifols made a proposal to Aradigm to purchase Aradigm's assets which Aradigm found unacceptable. Aradigm made two alternative counter-proposals to Grifols, to which Grifols did not respond.

Aradigm therefore concluded that it needed to retain an investment banker to effectively market its assets. Aradigm interviewed three candidates and selected EMA Partners to act as its investment banker. Aradigm filed its application to retain EMA Partners with the Bankruptcy Court on April 24, 2019. Grifols objected to the application. After hearings before the Bankruptcy Court, the application was approved by order entered on May 31, 2019.

EMA Partners conducted a robust sales process. EMA Partners identified and contacted over 50 potentially interested parties. Fourteen of these parties expressed interest and evaluated the opportunity. As a result of these efforts, there were multiple interested parties. One of these interested parties submitted a bid. This bid was subject to significant contingencies which, in Aradigm's view, made the bid unattractive.

Grifols subsequently made another proposal to Aradigm. The proposal contemplated a cash payment, additional cash payments upon the achievement of certain milestones and royalty payments based upon sale of the product. After negotiations, Aradigm determined that Grifols' proposal was the superior bid. Aradigm therefore accepted Grifols' proposal and encouraged the competing bidder to submit a higher and better bid at the Auction.

Grifols and Aradigm signed a non-binding letter of intent. Grifols proposed a draft asset

67987881v2

JMBM | Jeffer Mangels Butler & Mitchell LLP

1   purchase agreement and the parties extensively negotiated the terms of the APA. The parties

2   reached agreement on the terms of the APA and on February 18, 2020 the APA was signed by the

3   parties. The APA provided that the sale was subject to overbids through an auction process in the

4   Bankruptcy Court and did not impose any limitations on Aradigm's ability fully to market its

5   assets to other interested parties.

6        While negotiations over the APA were ongoing, EMA Partners remained in contact with

7   other interested potential bidders and worked to prepare such bidders for the process. EMA

8   Partners believed that a third party's interest in bidding on the Aradigm assets would be contingent

9   on a third party's ability to secure access to the commercial rights which were controlled by

10  Grifols. In light of that, EMA Partners had conference calls with some of the potential bidders to

11  encourage them to evaluate the Aradigm assets prior to commencement of an auction, and to

12  facilitate conversations with Grifols to explore a potential license arrangement for such

13  commercial rights.

14       The Grifols License was a significant complicating factor. Grifols advised Aradigm that

15  Grifols simultaneously was negotiating a transaction with a third party (Party X). Since March

16  2019 Party X has engaged in significant due diligence, and Aradigm has expended significant time

17  and resources to respond to Party X's due diligence requests.

18       Aradigm understood that as a practical matter Aradigm's transaction with Grifols was

19  contingent on the successful outcome of Grifols' negotiations with Party X. Aradigm also

20  understood that Grifols and Party X may be parties to an exclusivity agreement, the terms of

21  which were unknown to Aradigm. Moreover, a portion of the consideration payable to Aradigm in

22  the transaction was milestone payments and royalties. As a result, the value of the transaction for

23  Aradigm is dependent on the future performance by Party X in running clinical trials and

24  commercializing the product.

25       The possibility exists that Party X will be unable to complete the clinical trial or the trial

26  will be unsuccessful. Aradigm is aware that Party X is currently pursuing clinical trials for certain

27  of Party X's other assets. These other clinical trials will require a significant investment by Party X

28  which could affect Party X's ability successfully to complete the clinical trials of the Aradigm

JMBM | Jeffer Mangels Butler & Mitchell LLP

67987881v2

1 product.

2    Aradigm therefore was focused on insuring, to the greatest extent possible, that there

3 would be an open auction process. It was critical that the ultimate purchaser have the resources

4 and the obligation to continue to seek regulatory approval of the product. Thus, the APA provided

5 that if a competing bidder is the winning bidder at the Auction, Grifols' exclusivity obligations are

6 terminated such that Grifols is free to negotiate with the successful bidder. Furthermore, the APA

7 provides that Grifols is obligated to require its licensee to use commercially reasonable efforts to

8 obtain and support regulatory approval of the product.

9    **C.    Aradigm Sells its Assets to Grifols**

10        **1.    Terms of Sale**

11    Under the APA, Aradigm agreed to sell all of its intellectual property assets and certain

12 other assets to Grifols. The purchase price was $3,247,000 in cash payable at closing, plus

13 milestone payments amounting to an additional $3 million (the "Milestone Payments") and a

14 royalty of 25% of the royalties received by Grifols during the royalty term in connection with the

15 sale of any Aradigm Product under any definitive agreement between Grifols and any licensee for

16 the development and commercialization of any Aradigm Product (the "Royalty Payments"). The

17 Milestone Payments are payable $2 million upon FDA approval of any Aradigm Product and $1

18 million upon EMA approval of any Aradigm Product. The royalty term is the shorter of 10 years

19 after the first commercial sale of an Aradigm Product or the expiration of the last Aradigm Patent

20 covering an Aradigm Product. In addition, Grifols and its affiliate Grifols Worldwide Operations,

21 Limited, agreed to waive their filed proofs of claim in the Bankruptcy Case in the total amount of

22 $31,735,898.90.

23    Aradigm assumed and assigned to the purchaser certain executory contracts. The contract

24 counterparty certain of the contracts is Oregon State University, the contract counterparty on

25 others is Exelead, Inc., and the contract counterparty on the remaining assigned contracts is

26 Grifols. Aradigm paid $247,000 to Exelead, Inc. to cure all defaults under the contracts with it and

27 $20,971.41 to cure all defaults under two of the contracts with Oregon State University. No cure

28 payments were due and owing with respect to the contracts with Grifols. In addition, Aradigm

JMBM | Jeffer Mangels
Butler & Mitchell LLP

67987881v2

DEBTOR'S MODIFIED COMBINED CHAPTER 11 PLAN AND DISCLOSURE STMNT (DTD JUNE 8, 2020)

agreed to pay an additional $44,296.66 from the proceeds of a National Institute of Health grant in favor of Aradigm when such proceeds are received to cure the defaults under certain other assigned contracts with Oregon State University.

### 2. Risk Factors

Aradigm estimates that the process to obtain FDA and EMA approval could take up to 5 years. Moreover, there is no assurance that either or both approvals will be obtained. Whether and when US or European approval of an Aradigm product will be obtained, triggering Aradigm's right to receive the Milestone Payments, is uncertain. Thus, the Milestone Payments will likely not be received for as much as 5 years, and might not be received at all.

Similarly, the timing and amount of Royalty Payments is also uncertain because it is dependent on successful marketing and sale of any resulting product which has received regulatory approval. The royalty term is the shorter of ten years after the first commercial sale of an Aradigm Product or the expiration of the last Aradigm Patent covering an Aradigm Product, meaning that the deferred consideration payable to Aradigm is payable over a period of up to 15 years. If neither FDA nor EMA approval is obtained, there will be no sales of the Aradigm product and therefore no Royalty Payments.

### 3. Rough Estimate of the Value of the Projected Royalty Payments

Aradigm has attempted to estimate the value of the Royalty Payments. The information available to Aradigm permits only a very rough estimate. The Royalty Payments are 25% of the royalties received by Grifols during the royalty term in connection with the sale of any Aradigm Product under any definitive agreement between Grifols and any licensee for the development and commercialization of any Aradigm Product. Aradigm understands that Grifols' licensee is Party X, but Aradigm does not know the terms of the agreement between Grifols and Party X. Aradigm therefore does not know what royalties Grifols is entitled to receive, 25% of which go to Aradigm.

Aradigm understands that Party X agreed to pay to Grifols a tiered, low double-digit royalty based on annual global net sales, which is subject to reduction if another inhaled ciprofloxacin product is introduced into the market. Party X is obligated to make such royalty payments on a country-by-country and product-by-product basis until the later of (1) 10 years after

67987881v2

the first commercial sale of a product in a country, (2) expiration of the last patent covering that product in that country, or (3) the date a generic inhaled liposomal ciprofloxacin is introduced in that country.

Aradigm's right to the Royalty Payments depends upon the volume of sales of the Aradigm product after regulatory approval is obtained as described above. In 2018 when Aradigm was pursuing regulatory approval, estimates of commercial sales over the Royalty Term ranged from $350 million to as high as $1 billion. Actual sales could be more or less than these estimates.

Based on the available information, EMA Partners, Aradigm's investment bankers, constructed a financial model to value the royalty stream. The model is based on several key assumptions, including market size and the royalty rate payable to Grifols by Party X. The model incorporates Aradigm's estimate of market size and other financial assumptions provided by Aradigm and from third party sources, which have not been independently verified by EMA Partners. Aradigm also made its best guess as to the royalty rate payable to Grifols by Party X. Aradigm's guess is based upon statements by Grifols and Party X, but Aradigm has not reviewed the license agreement between them, and therefore Aradigm can only speculate. Aradigm estimated the total royalties that might be paid over time, based on (a) the guess as to the royalty rate; (b) sales projections; and (c) an estimate of market size and percentage of market penetration for a successful product. Neither Aradigm nor EMA Partners makes any representations or warranties with regard to future financial performance of the products.

The Milestone Payments and Royalty Payments are payable over a term of up to 15 years. EMA Partners therefore discounted the projected payment stream to present value at a discount rate of 20% to arrive at an estimated net present value of $25,187,000. This is an estimate only. The actual amounts received may vary from the amounts forecast.

### D. Approval of the Bidding Procedures and of the Sale

After the APA was signed, Aradigm filed a motion to approve the bidding procedures set forth in the APA for the auction process and a motion to approve the sale to the party making the highest and best bid for its assets. The Bankruptcy Court modified the proposed bidding procedures and as modified approved them. Following approval of the bidding procedures,

Aradigm and its investment bankers continued to market Aradigm's assets to interested parties. However, no party submitted a competing bid. Aradigm therefore cancelled the scheduled auction and requested that the Court approve the sale to Grifols on the terms set forth in the APA. On March 30, 2020 the Bankruptcy Court entered an order approving the sale. The sale closed on March 31, 2020. After repayment of the DIP Loans as described below, and payment of the cure amounts to Exelead, Inc. and Oregon State University as described above, Aradigm received net cash proceeds of $834,933.

### E. The DIP Loan

Aradigm believed that one key to a successful sales process was to have adequate time to market its assets effectively. This was especially true given the complexity of the ownership structure of Aradigm's assets. Grifols' exclusive rights to commercialize any Aradigm product was a complication in the sales process. Accordingly, in order to obtain additional funding and thereby provide increased runway to market and sell its assets, Aradigm entered into a debtor in possession loan agreement (the "DIP Loan") with two of the investment funds managed by Bleichroeder, 21 April Fund, Ltd. and 21 April Fund, L.P. (the "DIP Lenders"). The DIP Loan was approved by order of the Bankruptcy Court entered on June 6, 2019. The principal balance owing is $2 million, plus interest, and the DIP Loan is secured by a security interest in substantially all of Aradigm's assets. The DIP Loan, plus interest was repaid from the proceeds of the sale. The total amount repaid was $2,144,096.

### F. Rejection of Lease and Disposition of Surplus Equipment

In order to conserve cash, Aradigm determined to reject is office lease and to move to a less expensive location. Aradigm therefore filed motions to reject the lease, to abandon certain equipment and to sell certain other equipment. These motions all were granted by the Bankruptcy Court.

### PART 3
### CLASSIFICATION AND TREATMENT OF CLAIMS

Claims are classified below (except for administrative priority claims) for all purposes, including voting, confirmation and distributions pursuant to this Plan. A claim is classified in a

67987881v2

DEBTOR'S MODIFIED COMBINED CHAPTER 11 PLAN AND DISCLOSURE STMNT (DTD JUNE 8, 2020)

JMBM  Jeffer Mangels Butler & Mitchell LLP

particular class only to the extent the claim qualifies within the description of the class and is classified in a different class to the extent that any remainder of the claim qualifies within the description of such different class. A claim is in a particular class only to the extent that the claim is an allowed claim pursuant to Bankruptcy Code Section 502 and has not been paid, released or otherwise satisfied before the Effective Date of the Plan. The following is a summary of the treatment of each class proposed under this Plan:

| Class | Description | Proposed Treatment | Entitled to Vote? |
|-------|-------------|-------------------|-------------------|
| 1 | Priority Wage and Priority Tax Claims | Paid in Full From Cash on Hand Within 30 Days of the Effective Date | Yes |
| 2 | General Unsecured Creditors | *Pro Rata* Payment From Milestone Payments and Royalty Payments, if and When Received | Yes |
| 3 | Shareholders | *Pro Rata* Payment From Milestone Payments and Royalty Payments, if and when received, after Class 2 is paid in full, with interest | Yes |

Disputes regarding proper classification of claims not specifically classified in this Plan shall be resolved pursuant to the procedures established by the Bankruptcy Code, other applicable law and procedures and this Plan; resolution of such disputes shall not be a condition to the confirmation or consummation of this Plan.

**Class 1:** **Priority Claims**

This class consists of the priority wage claims held by Aradigm's former employees and any priority tax claims. Aradigm believes that all priority taxes have been paid and that there are no priority tax claims. There are approximately $154,200 of priority wage claims.

1. <u>Classification</u>. This class consists of allowed claims entitled to priority under Bankruptcy Code Section 507(a)(4) and allowed claims entitled to priority under Bankruptcy Code Section 507(a)(8).

2. <u>Treatment</u>. Within thirty (30) calendar days of the Effective Date of this Plan, each holder of an allowed claim in this class shall receive a single payment equal to 100% of such

JMBM Jeffer Mangels Butler & Mitchell LLP

67987881v2

holder's allowed claim. Claims in this class shall not accrue interest.

       3.     <u>Impairment</u>. This class is impaired and is entitled to vote upon this Plan.

**Class 2:**      **Claims of General Unsecured Creditors**

      This class consists of the claims held by general unsecured creditors. Aradigm is not presently able to project the timing or the amount of distributions on account of general unsecured claims with any certainty. As described in Section 3 above, Aradigm's assets were sold to Grifols for cash and deferred, contingent compensation consisting of the right to receive the Milestone Payments and the Royalty Payments. Whether and when USA or European approval of an Aradigm Product will be obtained, triggering Aradigm's right to receive the Milestone Payments, is uncertain. Similarly, because Aradigm's right to the Royalty Payments depends upon the volume of sales of Aradigm product after regulatory approval is obtained, the timing and amount of Royalty Payments is also uncertain.

      Aradigm projects that the cash held by the estate on the Effective Date will not be sufficient to make a distribution to holders of allowed class 2 claims and that the Liquidating Trust formed by this plan most likely will not have sufficient cash to make a distribution to holders of allowed class 2 claims unless and until at least one of the Milestone Payments in received which likely will not be until up to 5 years after the Effective Date. As a result, there most likely will not be a distribution to holders of allowed class 2 claims until Aradigm shall have received at least one of the Milestone Payments.

      1.     <u>Classification</u>. This class consists of the allowed claims held by general unsecured creditors.

      2.     <u>Treatment.</u> Holders of allowed claims in this class shall be paid *pro rata* from funds received by the Liquidating Trust on account of the Milestone Payments and the Royalty Payments after payment of administrative priority expenses. Distributions to holders of allowed Class 2 claims shall be made until all such claims have been paid in full plus interest at the fixed rate of 2.6% from and after the Petition Date.

      3.     <u>Impairment</u>. This class is impaired and is entitled to vote upon this Plan.

JMBM | Jeffer Mangels Butler & Mitchell LLP

67987881v2

**Class 3:**     **Shareholders**

1.     Classification. This class consists of the allowed interests held by shareholders of record as of the Effective Date, including all warrants and issued shares.

2.     Treatment. On the Effective Date all interests in Aradigm, including all warrants, unexercised options, and issued shares, shall be cancelled. Holders of allowed interests shall receive *pro rata* distributions from funds received by the Liquidating Trust on account of the Milestone Payments and the Royalty Payments after payment of administrative priority expenses and after payment in full, plus interest, of allowed Class 2 claims. Distributions to holders of allowed Class 3 interests shall be made until all assets of the estate have been reduced to cash and distributed.

3.     Impairment. This class is impaired and is entitled to vote upon this Plan.

**PART 4**
**PRIORITY CLAIMS AND EXPENSES OF ADMINISTRATION**

Claims entitled to administrative priority under Bankruptcy Code Section 507(a)(2) are not classified. Each administrative priority claim shall be paid in full on the later of the Effective Date of this Plan or the date such claim becomes an allowed claim, whichever is later, unless the holder of such claim consents to different treatment; provided, however, that administrative claims incurred in the ordinary course of business shall be paid in accordance with the terms and conditions of any agreements pertaining thereto.

(a)     Professional Fees. Professional fees incurred prior to confirmation of this Plan may be paid only upon approval by the Bankruptcy Court. Unpaid professional fees shall be paid on the Effective Date of the Plan or approval, unless the holder of a claim for professional fees consents to a later payment.

Aradigm estimates that the estate will be subject to the following claims for professional fees as of the Effective Date of this Plan:

/ / /

/ / /

/ / /

| Professional | Role | Estimated Claim |
|---|---|---|
| Jeffer Mangels Butler & Mitchell, LLP | Counsel for Aradigm | $275,000 |
| EMA Partners LLC | Investment Banker for Aradigm | $162,350 |
| Moss Adams LLP | Tax Accountants for Aradigm | $16,000 |
| Bozicevic Field & Francis, LLP | Patent counsel to Aradigm | $58,367 |
| Rose Ryan, Inc. | Technical accounting for Aradigm | $7,500 |
| | Total | $519,217 |

(b)    <u>U.S. Trustee Fees</u>. Any amount owed to the U.S. Trustee for fees payable under 28 U.S.C. § 1930 shall be paid in full on the Effective Date of the Plan. Commencing with the calendar quarter following the quarter in which the Effective Date occurs, the Trustee of the Liquidating Trust shall pay to the U.S. Trustee such amounts as are required to be paid under 28 U.S.C. § 1930(a)(6) until the within case is converted, dismissed, or closed. No U.S. Trustee's fees shall be payable for any period during which the case is closed notwithstanding any later re-opening thereof.

## PART 5
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Upon the Effective Date of this Plan, Aradigm shall reject all executory contracts and unexpired leases not by then assumed by a final order of the Bankruptcy Court. The last date upon which a proof of claim for damages arising from rejection of said executory contracts and unexpired leases may be filed shall be thirty (30) calendar days from the date the order confirming this Plan is entered. Upon the Effective Date of this Plan, Aradigm shall surrender any interest in property securing said executory contracts and unexpired leases.

In connection with the extension of the extension of certain of Aradigm's insurance policies, Aradigm's insurance carrier requested that Aradigm include certain provisions in this Plan. Aradigm agreed to this request. These provisions are set forth below.

Notwithstanding anything to the contrary in this Plan, the Confirmation Order, any bar date notice or claim objection, any other document related to any of the foregoing, or any other order of

67987881v2

DEBTOR'S MODIFIED COMBINED CHAPTER 11 PLAN AND DISCLOSURE STMNT (DTD JUNE 8, 2020)

JMBM | Jeffer Mangels Butler & Mitchell LLP

1  this Court (including, without limitation, any provision that purports to be preemptory or

2  supervening, grants an injunction or release, requires any party to opt out of any releases or

3  confers Bankruptcy Court jurisdiction): (i) nothing alters the rights and obligations of Aradigm

4  and Federal Insurance Company, Vigilant Insurance Company, and/or their respective affiliates

5  (collectively, and with each of their successors, "Chubb") under any insurance policies or any

6  related agreements issued by Chubb to Aradigm (the "Chubb Insurance Contracts"); (ii) nothing

7  modifies the coverage provided under any of the Chubb Insurance Contracts or the terms and

8  conditions thereof except that, on and after the Effective Date, the Liquidating Trust shall become

9  and remain liable in full for all of the obligations under the Chubb Insurance Contracts (including

10  those of Aradigm), regardless of whether such obligations arise before or after the Effective Date,

11  without the requirement or need for Chubb to file or serve a request, motion, or application for

12  payment of or proof of any Claim or Administrative Claim or file or object to any Cure

13  Claim/Amount/Notice (and further and for the avoidance of doubt, any claim bar date shall not be

14  applicable to Chubb); and (iii) the automatic stay of Bankruptcy Code section 362(a) if and to the

15  extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (a)

16  claimants with direct action claims against Chubb under applicable non-bankruptcy law to proceed

17  with their claims; (b) Chubb to administer, handle, defend, settle, and/or pay, in the ordinary

18  course of business and without further order of this Bankruptcy Court, (I) claims where a claimant

19  asserts a direct claim against Chubb under applicable non-bankruptcy law, or an order has been

20  entered by this Court granting a claimant relief from the automatic stay to proceed with its claim,

21  and (II) all costs in relation to each of the foregoing; and (c) Chubb to cancel any Chubb Insurance

22  Contracts, and take other actions (including any right or setoff and recoupment) relating to the

23  Chubb Insurance Contracts, to the extent permissible under applicable non-bankruptcy law, and in

24  accordance with the terms of the Chubb Insurance Contracts. All rights and obligations under the

25  Chubb Insurance Contracts shall be determined under the applicable Chubb Insurance Contracts

26  and applicable non-bankruptcy law.

27  / / /

28  / / /

**PART 6**
**DISPUTED AND DISALLOWED CLAIMS**

(a)    <u>Distribution on Allowed Claims and Interests Only</u>. The Trustee of the Liquidating Trust shall make distributions only on account of allowed claims and interests. If a creditor has filed a proof of claim, that claim is considered disputed only if a party-in-interest files an objection to the claim. If a party has not filed a proof of claim, but its claim is listed in Aradigm's schedules and is not scheduled as disputed, contingent, or unliquidated, such claim is considered disputed only if a party-in-interest files an objection to the claim.

(b)    <u>Delayed Distribution on Disputed Claims and Interests</u>. The Trustee of the Liquidating Trust shall make no distribution on account of a disputed claim or interest unless and until such claim is allowed by a final order or settlement in accordance with Part 13(d) of this Plan. If a disputed claim purports to be a secured claim and the purported collateral is sold, then the Trustee of the Liquidating Trust shall reserve an amount equal to the purportedly secured portion of the disputed claim and shall not distribute said amount until the dispute has been resolved by final order of the Court or settlement in accordance with Part 13(d) of this Plan. In all other cases, the Trustee of the Liquidating Trust shall reserve and withhold from distributions any amounts the Trustee deems necessary, in the Trustee's sole discretion, with regard to disputed claims or interests pending resolution of the dispute by final order of the Court or settlement in accordance with Part 13(d) of this Plan.

(c)    <u>Settlement of Disputed Claims</u>. The Trustee of the Liquidating Trust is authorized to settle and compromise a disputed claim in the Trustee's sole discretion without Court approval.

(d)    <u>Objections to Claims</u>. The Trustee of the Liquidating Trust is authorized to object to any claim or interest. There shall be no deadline for the Trustee of the Liquidating Trust to file objections to claims or interests. The Bankruptcy Case may be reopened for the purpose of filing objections to claims or interests. Aradigm anticipates that no objections to claims or interests will be filed unless and until the Milestone Payments are received. The failure to object to a claim or interest shall not be deemed to be a waiver of any objection to such claim or interest.

/ / /

67987881v2

JMBM | Jeffer Mangels Butler & Mitchell LLP

(a)    <u>Creation of theTrust</u>. The Liquidating Trust shall be formed upon confirmation of this Plan. A copy of the Liquidating Trust Agreement is attached hereto as Exhibit "B" and incorporated by reference, Upon confirmation of this Plan, the Trustee of the Liquidating Trust shall be deemed to have accepted all rights and obligations provided under this Plan. In the event of any inconsistencies or conflicts between the Liquidating Trust Agreement and this Plan, the terms of this Plan shall control.

Upon the Effective Date, Susan Uecker shall be appointed Trustee of the Liquidating Trust. Any successor to the Trustee of the Liquidating Trust shall be appointed as provided in the Liquidating Trust Agreement. Ms. Uecker is not now and never has been affiliated with Aradigm, Grifols, First Eagle, Party X or Bleichroeder.

The Trustee of the Liquidating Trust shall be entitled to sell any asset of the estate without further order of the Court, except that the Trustee shall not sell or compromise the right to receive the Milestone Payments or the Royalty Payments without the consent of Bleichroeder or the approval of the Bankruptcy Court. The Trustee of the Liquidating Trust shall be further entitled to turn over collateral or leased property in return for full or partial satisfaction of claims against the estate, in her sole discretion, without further order of the Court. The Trustee of the Liquidating Trust shall be further entitled to abandon any asset of the estate if she determines that such asset is burdensome to the estate or of inconsequential value and benefit to the estate, without further order of the Court.

(b)    <u>Assets Transferred to Liquidating Trust; Tax Treatment</u>. Upon the Effective Date, all assets of the estate (of every kind, wherever located and by whomever possessed) shall be transferred to, and all title and interest shall vest in, the Liquidating Trust, without further action by Aradigm, the Trustee of the Liquidating Trust or order of the Court. For federal income tax purposes, all parties (including, without limitation, Aradigm, the Trustee of the Liquidating Trust and the holders of unsecured claims allowed either before or after the Effective Date of the Plan) shall treat said transfer as a transfer to the holders of allowed Class 2 claims and, after payment in

JMBM | Jeffer Mangels
Butler & Mitchell LLP

67987881v2

full of allowed Class 2 claims, plus interest, to holders of allowed Class 3 interests; said holders shall be deemed to have transferred said assets to the Trust; said holders shall be deemed to have received a beneficial interest in the Trust, as provided above, in exchange for their transfer to the Trust of said assets; and said holders shall be deemed to be the trustors of the Trust. To the extent that transfers of beneficial interests in the Liquidating Trust in exchange for allowed claims are deemed an offer or sale of securities, such transfers shall be exempt from Section 5 of the Securities Act of 1933 and any state or local law requiring registration for offer of sale of a security or registration or licensing of an issuer of, underwriter or, or broker or dealer in securities pursuant to Bankruptcy Code Section 1145(a). Holders of Class 2 claims and holders of Class 3 interests should consult their tax adviser regarding the effect of the formation of the Liquidating Trust.

(c)     <u>Compensation of Trustee and Professionals</u>. The Trustee of the Liquidating Trust shall be paid reasonable compensation on an hourly basis and reimbursement of expenses. The Trustee of the Liquidating Trust shall bill her time in increments of 1/10th of an hour. The compensation and reimbursement of the Trustee of the Liquidating Trust shall be entitled to administrative expense priority and shall be paid by the Trust without further order of the Court.

No more than once per calendar year, commencing on the date of confirmation of this Plan, the Trustee of the Liquidating Trust may increase the Trustee's compensation upon ten (10) calendar days' notice served by mail upon Bleichroeder, without further order of the Court. In the event that a party in interest objects to the proposed increase in compensation, the parties shall seek to resolve the dispute without the intervention of the Court. If the parties are unable to resolve their dispute within ten (10) calendar days after the objection is made, any party may file a motion to have the Court resolve the dispute.

The Trustee of the Liquidating Trust shall be authorized to employ and pay any professionals and employees, including attorneys, accountants, brokers, associates and administrative staff, as the Trustee deems reasonably necessary to assist in the performance of the Trustee's duties, without further order of the Court. The Trustee of the Liquidating Trust and the Trustee's professionals and employees shall bill their time in increments of 1/10th of an hour, with

JMBM | Jeffer Mangels Butler & Mitchell LLP

67987881v2

the exception of professionals working for a commission or contingency fee, which compensation shall be limited to a reasonable commission or fee. The compensation and reimbursement of expenses of professionals and employees of the Trustee of the Liquidating Trust shall have administrative expense priority and shall be paid by the Trust without further order of the Court. The Trustee of the Liquidating Trust shall send her billing statements and those of any professionals employed by the Trustee to Bleichroeder prior to payment.

(d) <u>Liquidation of Assets; Distributions</u>. The Trustee of the Liquidating Trust will use the cash contributed to the Liquidating Trust on the Effective Date to pay allowed administrative claims (to the extent not previously paid) and to pay allowed Class 1 claims. The balance of the cash shall be retained by the Trustee and used to fund the expenses of the operation of the Liquidating Trust pending the receipt of any future Milestone Payments and Royalty Payments.

Thus, the Trustee of the Liquidating Trust shall collect, liquidate or dispose of all assets of the estate. From proceeds received by the Liquidating Trust, as provided in this Plan, the Trustee of the Liquidating Trust shall: (1) first, pay administrative claims to the extent not previously paid (unless holders of such claims consent to other treatment); (2) second, pay allowed class 1 claims, (3) third, pay allowed class 2 claims; and (4) fourth, pay allowed class 3 interests. The Trustee of the Liquidating Trust shall endeavor to make distributions to holders of allowed class 2 claims and allowed class 3 interests as promptly as reasonably possible. The Trustee of the Liquidating Trust shall make interim distributions to holders of allowed class 2 claims and, after allowed class 2 claims are paid in full with interest, to holders of allowed class 3 interests as and when the Trustee has determined, in the exercise of the Trustee's sole discretion, that the Trustee has collected sufficient funds to justify the cost and expense of making such distributions. The Trustee of the Liquidating Trust shall be entitled to withhold from such distribution any and all amounts that the Trustee determines are required to be withheld by any law, regulation, rule, ruling, order, directive or other governmental requirement.

/ / /

/ / /

/ / /

JMBM | Jeffer Mangels Butler & Mitchell LLP

67987881v2

Case: 19-40363 Doc# 238 Filed: 06/08/20 Entered: 06/08/20 14:06:59 Page 27 of 64

DEBTOR'S MODIFIED COMBINED CHAPTER 11 PLAN AND DISCLOSURE STMNT (DTD JUNE 8, 2020)

(e) <u>Transfers Subject to Applicable Non-Bankruptcy Laws</u>. Pursuant to Bankruptcy Code Section 1129(a)(16), all transfers of property under this Plan shall be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

(f) <u>Termination of Liquidating Trust</u>. The Liquidating Trust shall terminate after liquidation, administration and distribution of its assets in accordance with this Plan and the Liquidating Trust Agreement. The Trustee of the Liquidating Trust shall be entitled to take all steps necessary to terminate the Trust without further order of the Court. Termination of the Liquidating Trust shall occur no later than the fifth (5th) anniversary of the Effective Date of this Plan, unless extended by order of the Court.

(g) *De Minimis* Distribution; Rounding. No distribution of less than $10 shall be made by the Trustee of the Liquidating Trust to any holder of a beneficial interest in the Trust, and any amounts less than said amount shall be cumulated and distributed with the subsequent distribution. The Trustee of the Liquidating Trust shall be entitled to waive said minimum as to a particular distribution if a request therefor is made in writing within thirty (30) calendar days after such distribution. Notwithstanding the foregoing, a payment of less than $10 shall be made if it is the only payment, or the final payment, that will be made on account of a beneficial interest in the Liquidating Trust. The Trustee of the Liquidating Trust shall be entitled to round the amount of any distribution down to the nearest whole dollar.

(h) <u>Undistributed Property</u>. If any distribution is returned to the Trustee of the Liquidating Trust, no further distributions shall be made to the holder of the beneficial interest in the Trust on account of whom such distribution was made unless the Trustee is notified in writing of such holder's current address. Any returned distribution shall be held for the benefit of such holder for thirty (30) calendar days, following which such holder shall be deemed to have waived, and shall not be entitled to, said distribution, and said distribution shall become a general asset of the Liquidating Trust to be distributed in accordance with this Plan. Nothing in this Plan shall require the Trustee of the Liquidating Trust to attempt to locate any holder of such interests.

/ / /

67987881v2

Any property that remains undeliverable to the holders of beneficial interests in the Liquidating Trust as of the ninetieth (90th) calendar day following liquidation or disposition of substantially all of the assets of the Trust, or upon the fifth (5th) anniversary of the Effective Date of this Plan (unless extended by order of the Court) if substantially all assets of the Trust have been liquidated or disposed of, shall be distributed to other holders of such interests in accordance with this Plan, notwithstanding any federal or state escheat laws to the contrary. Thereafter, if the Liquidating Trust possesses funds or assets not duly claimed, or if it would not be cost effective to make a final distribution, such property shall be donated to a public charity that is tax exempt under Internal Revenue Code Section 501(c)(3) of the choosing of the Liquidating Trustee.

(i)     Closing and Reopening Bankruptcy Case. In order to reduce US Trustee fees and other administrative expenses of the Liquidating Trust, the Liquidating Trustee is authorized to seek to close the Bankruptcy Case after paying administrative claims and making the distribution to holders of Class 1 claims. The Liquidating Trustee is authorized to seek to reopen the Bankruptcy Case to seek to extend the term of the Liquidating Trust, to object to claims, or for other cause. In the event the Bankruptcy Case is reopened, and continuing until the Bankruptcy Case is closed, (x) the Liquidating Trust will be subject to US Trustee fees commencing with the date of entry or the order reopening the Bankruptcy Case, and (y) the Trustee of the Liquidating Trust shall file with the Bankruptcy Court and serve upon Bleichroeder the Quarterly Post-Confirmation Reports required by Section 7.2 of the Guidelines of the Office of the United States Trustee.

(j)     Reports to Beneficiaries. The Trustee of the Liquidating Trust shall be subject to the oversight of Bleichroeder. So long as the Bankruptcy Case remains open, the Trustee of the Liquidating Trust shall file with the Bankruptcy Court and serve upon Bleichroeder the Quarterly Post-Confirmation Reports required by Section 7.2 of the Guidelines of the Office of the United States Trustee. After the Bankruptcy Case is closed, for so long as the Liquidating Trust shall remain in existence, the Trustee of the Liquidating Trust shall prepare and send Bleichroeder an annual report of the cash receipts and disbursements of the Trust. The Trustee of the Liquidating Trust shall send the information requested by holders of allowed claims and interests as provided

67987881v2

1  in Section 3.4 of the Liquidating Trust Agreement.

2  (k)    Provisions Concerning the Senior Notes.

3  U.S. Bank National Association is the indenture trustee (the "Indenture Trustee") for the

4  9.0% Convertible Senior Notes due 2021 (the "Senior Notes"), and acts for the holders and

5  beneficial owners of the Senior Notes (the "Senior Noteholders"). The Senior Notes were issued

6  pursuant to that certain Indenture, dated as of April 25, 2016, between Aradigm, as issuer, and the

7  Indenture Trustee (as has been, and may be further be, amended or supplemented from time to

8  time, the "Indenture"). The Senior Notes are unsecured obligations of Aradigm and are included in

9  Class 2 General Unsecured Claims (the "Senior Notes Claims"). The holders of the Senior Notes

10 are Grifols, Grifols Worldwide Operations Limited, First Eagle Value in Biotechnology Master

11 Fund, Ltd., 21 April Fund, Ltd., and 21 April Fund, L.P. As described above, Grifols and Grifols

12 Worldwide Operations Limited waived their rights to distributions with respect to their Senior

13 Note Claims. For the avoidance of doubt, and notwithstanding such waiver, the Indenture

14 Trustee's claim on account of the Senior Notes may only be modified or amended in accordance

15 with the Indenture.

16 Notwithstanding anything to the contrary in the Plan, the Indenture shall continue in effect

17 following the Effective Date solely to the extent necessary to (i) allow the holders of Senior Note

18 Claims to receive distributions under the Plan, (ii) allow the Liquidating Trustee and the Indenture

19 Trustee to make post-Effective Date Distributions or take such other action pursuant to the Plan on

20 account of the Senior Note Claims and to otherwise exercise their rights and discharge their

21 obligations related to the interests of the holders of such Senior Notes Claims in accordance with

22 the Plan, (iii) allow the Indenture Trustee to enforce any obligations owed thereto under the Plan

23 (including, without limitation, seeking compensation and reimbursement for any reasonable and

24 documented fees and expenses solely and exclusively pursuant to the charging lien provided by

25 Section 7.06 of the Indenture (the "Charging Lien")) and allow the Indenture Trustee to maintain

26 any right of indemnification, contribution, subrogation or any other Claim it may have under the

27 Indenture, (iv) permit the Indenture Trustee to perform any function necessary to effectuate the

28 foregoing, and (v) permit the Indenture Trustee to appear in the Bankruptcy Case or in any

JMBM | Jeffer Mangels Butler & Mitchell LLP

67987881v2

proceeding in the Bankruptcy Court or any other court relating to the Indenture, *provided that* nothing in this Part 7.k shall affect the discharge of Claims pursuant to the Bankruptcy Code or the Confirmation Order. For the avoidance of any doubt, the Indenture Trustee shall be entitled to assert its Charging Lien arising under and in accordance with the Indenture and any ancillary document, instrument, or agreement to obtain payment of its fees and expenses as set forth in Section 7.06 of the Indenture (the "Trustee Fees and Expenses") and nothing in this plan shall prejudice the Indenture Trustee's right to receive payment of the Trustee Fees and Expenses consistent with the Indenture, provided that the Indenture Trustee's sole and exclusive right to payment for the Trustee Fees and Expenses shall be to assert its Charging Lien.

As described above, Grifols and Grifols Worldwide Operations Limited waived their rights to recovery with respect to their Senior Note Claims. As a result, for all purposes under the Plan, including for purposes of receiving distributions under the Plan on account of all claims based on the Senior Notes and the Indenture, including Claim No. 23 filed by the Indenture Trustee for the outstanding amount due on the Senior Notes and Claim Nos. 24, 25, and 26 filed by First Eagle Value In Biotechnology Master Fund, Ltd., 21 April Fund, Ltd., and 21 April Fund LP, with respect to its Senior Note Claims, the Debtor and the Liquidating Trustee are entitled to calculate all remaining claims based on the Senior Notes and the Indenture, including Claim Nos. 23, 24, 25, and 26, in the aggregate amount of $4,492,922 (as set forth in Claim Nos. 24, 25, and 26, with respect to each of the Noteholders as set forth therein). Claim No. 23 shall not be subject to any objection, further reduction, counterclaim, offset, recharacterization, subordination, recoupment or other defense or challenge and shall be substituted for all claims of individual holders of Senior Notes and all claims of the individual holders of the Senior Notes (including Claim Nos. 24, 25, and 26) shall not be entitled to direct distribution. On the Effective Date, all claims of individual holders of Senior Notes shall be settled and compromised in exchange for the distribution to the Indenture Trustee of the amounts due to the beneficial holders of Senior Notes under the Plan calculated as provided herein, subject to the right of the Indenture Trustee to assert its Charging Liens against all distributions.

/ / /

JMBM | Jeffer Mangels
Butler & Mitchell LLP

67987881v2

DEBTOR'S MODIFIED COMBINED CHAPTER 11 PLAN AND DISCLOSURE STMNT (DTD JUNE 8, 2020)

Except as to (i) the agreements, promises, settlements, reservations, representations, claims allowances and warranties expressly set forth in the Plan, and (ii) the performance of the obligations set forth in the Plan, the Debtor, Indenture Trustee, First Eagle Value In Biotechnology Master Fund, Ltd., 21 April Fund, Ltd., and 21 April Fund LP, and Grifols ("Parties"), on behalf of themselves and their respective successors and assigns, agree and covenant not to sue, and fully and forever release, discharge and acquit each of the other Parties, and their respective parents, subsidiaries and affiliates, and each of their respective successors, assigns, officers, directors, members, partners, employees, agents, representatives, consultants, financial advisors, accountants and attorneys, from any and all manners of claims, actions, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses, and other claims of every kind, nature, and character whatsoever existing as of the date hereof, whether at law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulation, tort (excluding intentional torts, fraud, recklessness, gross negligence or willful misconduct) or otherwise, accrued or unaccrued, known or unknown, matured or unmatured, liquidated or unliquidated, certain or contingent, including, based in whole or in part on any act, omission, transaction, event or other circumstance in any way arising from, relating to the calculation of the remaining claims based on the Senior Notes and the Indenture, including Claim Nos. 23, 24, 25, and 26.

Except for the foregoing, on and after the Effective Date, all duties and responsibilities of the Indenture Trustee shall be fully discharged (i) unless otherwise specifically set forth in or provided for under the Plan or the Confirmation Order, and (ii) except with respect to such other rights of the Indenture Trustee that, pursuant to the Indenture, survive termination of the Indenture. Subsequent to the performance by the Indenture Trustee of its obligations pursuant to the Plan and Confirmation Order, the Indenture Trustee and its agents shall be relieved of all further duties and responsibilities related to the Indenture. Any fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date solely in connection with the implementation of the Plan, including, but not limited to, making distributions pursuant to and in accordance with the Plan, are expressly subject to the

JMBM | Jeffer Mangels Butler & Mitchell LLP

Trustee's Charging Lien and its right to seek payment under the Indenture, provided that the Indenture Trustee's sole and exclusive right to seek payment for any such fees and expenses shall be to assert its Charging Lien.

Distributions on account of the allowed Senior Notes Claims, shall be made by the Liquidating Trustee to the Indenture Trustee. The Indenture Trustee, in its capacity as disbursing agent under the Indenture, shall administer the distributions in accordance with the Plan and the Indenture and be entitled to assert its Charging Lien over any such distributions. For the avoidance of doubt, nothing herein shall be deemed to impair, waive or extinguish any rights of the Indenture Trustee with respect to its Charging Lien.

The Indenture Trustee, acting as disbursing agent, shall only be required to act and make distributions in accordance with the terms of the Plan and the Indenture and shall have no (i) liability for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan, or (ii) obligation or liability for distributions under the Plan to any party who does not hold a Claim against Aradigm or who does not otherwise comply with the terms of the Plan. Upon final administration of the distributions made to the Indenture Trustee in accordance with the Plan and the Indenture, the Indenture Trustee shall be discharged from any further responsibility under this Plan.

## PART 8
## LIQUIDATION ANALYSIS

The following liquidation analysis compares the amounts Aradigm estimates general unsecured creditors will receive pursuant to the Plan with the amounts said creditors are likely to receive in a hypothetical liquidation under Chapter 7 of the Bankruptcy Code. The assets and liabilities described below are estimated for the purposes of this analysis only and shall not be binding.

/ / /

/ / /

/ / /

/ / /

JMBM | Jeffer Mangels Butler & Mitchell LLP

Case: 19-40363   Doc# 238   Filed: 06/08/20   Entered: 06/08/20 14:06:59   Page 29 of 58

DEBTOR'S MODIFIED COMBINED CHAPTER 11 PLAN AND DISCLOSURE STMNT (DTD JUNE 8, 2020)

## Aradigm Corporation
## Liquidation Analysis
### Based on June 15, 2020 Effective Date

| Asset | Estimated Plan Value as of Effective Date (6/15)[1] | | Liquidation Value as of Effective Date (6/15)[2] | |
|---|---|---|---|---|
| Assets | Low | High | Low | High |
| Cash and Cash Equivalents [3] | $1,100,000 | $1,100,000 | $1,100,000 | $1,100,000 |
| NIH Receivable [4] | $0 | $71,177 | $0 | $71,177 |
| Milestone Payments and Royalty Payments [5] | $0 | $25,187,000 | $0 | $25,187,000 |
| Total Assets | $1,100,000 | $26,258,177 | $1,100,000 | $26,258,177 |
| | | | | |
| Liabilities | Estimated Amount | | Estimated Amount | |
| Administrative Expenses | Low | High | Low | High |
| Chapter 7 Trustee Fees [6] | N/A | N/A | $56,250 | $810,995 |
| Chapter 7 Trustee Professional Fees [6] | N/A | N/A | $200,000 | $350,000 |
| Chapter 11 Administrative Expenses [7] | $519,217 | $519,217 | $519,217 | $519,217 |
| Liquidating Trustee Fees and Professional Fees [8] | $100,000 | $250,000 | N/A | N/A |
| Liquidating Trustee Professional Fees [9] | $100,000 | $250,000 | | |
| Total Administrative Expenses | $719,217 | $1,019,217 | $775,467 | $1,680,212 |
| Funds Remaining For Creditors | $380,783 | 25,238,960 | $324,533 | $24,577,965 |
| Class 1: Priority Claims [10] | $154,200.00 | | $154,200.00 | |
| Class 2: General Unsecured Claims [11] | 6,966,286 | | $6,966,286 | |
| | | | | |
| Percentage Recovery for General Unsecured Claims | 3.25% | 100% | 2.4% | 100% |
| Funds Available to Shareholders | 0 | $18,118,474 | 0 | $17,457,480 |

**Liquidation Analysis Footnotes:**

[1]  Estimated values prepared by the Debtor. Assumes a June 15, 2020 Effective Date for the Plan.

[2]  Estimated values prepared by the Debtor. Assumes a June 15, 2020 Effective Date for the Plan.

[3]  This is the Debtor's projected cash on hand as of June 15, 2020.

[4]  This is a  receivable due Aradigm by the National Institute of Health, net of cure payments to be made from these funds.

[5]  Milestone Payments consists of the Debtor's right to receive $3 million pursuant to the APA with Grifols. Royalty

JMBM | Jeffer Mangels Butler & Mitchell LLP

67987881v2

Payments consist of the Debtor's right to receive royalty payments on the sales of the Aradigm product pursuant to the APA with Grifols. The estimated values are described in Part 2.C.3 of the Plan

[6]   Chapter 7 Trustee fees are calculated as provided in 11 U.S.C. § 326(a) and Chapter 7 Counsel fees are an estimate by the Debtor.

[7]   Professional fees are described in detail in Part 4 of the Plan.

[8]   This is an estimate provided by the proposed Liquidating Trustee of the Liquidating Trustee's fees for the six years after the Effective Date.

[9]   This is an estimate of the Liquidating Trustee's professional fees for legal and accounting services for the six years after the Effective Date.

[10] Priority claims consist of amounts due to the Debtor's former employees. There is a filed priority tax claim in the amount of $10,440.43, but such claim was satisfied pre-petition.

[11] This is from the Debtor's schedules and the filed proofs of claim. This figure excludes the filed claims of Grifols and Exelead.

## PART 9
## VOTING

(a)      <u>Who May Vote</u>. The Bankruptcy Court fixed the record date for voting as April 24, 2020. Holders of allowed claims in class 1 or class 2 and holders of allowed interests in class 3, in each case as of the record date, are entitled to vote on confirmation of the Plan unless an objection or adversary proceeding has been filed with respect to that creditor's or interest holder's claim. A creditor whose claim has been objected to and who wishes to vote must move to have its claim allowed for voting purposes by filing a motion for such relief in time for that motion to be heard at or before the confirmation meeting.

(b)      <u>How to Vote</u>. All ballots must be received by Aradigm's counsel on or before 5:00 pm San Francisco time on June 1, 2020. Ballots must be delivered by mail, overnight delivery or email and addressed as follows:

Jeffer Mangels Butler & Mitchell LLP
Two Embarcadero Center, Suite 500
San Francisco, CA 94111
Attention: Bennett G. Young
byoung@jmbm.com

(c)      <u>Effect of Vote</u>. The Plan will be confirmed only if it is accepted by each impaired class, or if it is accepted by at least one impaired class (exclusive of insiders) and the court determines it is fair and equitable to all dissenting classes. A class of creditors accepts the Plan if it is accepted by a majority in number and two-thirds in dollar amount of creditors who cast ballots.

JMBM | Jeffer Mangels Butler & Mitchell LLP

67987881v2

A class of interests accepts the Plan if it is accepted by two-thirds in dollar amount of interest holders who cast ballots. Aradigm reserves the right to seek confirmation of the Plan notwithstanding the rejection of the Plan by one or more classes of creditors pursuant to Bankruptcy Code Section 1129(b).

## PART 10
## TRANSFERS NOT SUBJECT TO TAX

Pursuant to Bankruptcy Code Section 1146, the execution, delivery, or recording of an instrument of transfer pursuant to, in implementation of, or as contemplated by this Plan, including, without limitation, any transfers to or by the Liquidating Trust or the Trustee of the Liquidating Trust, shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument may be recorded hereunder shall, pursuant to the order confirming the Plan, be ordered and directed to accept such instrument without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

## PART 11
## EFFECT OF CONFIRMATION

(a) <u>Dissolution of Aradigm</u>. Upon the Effective Date, Aradigm shall be deemed to have been wound up and dissolved. The Trustee of the Liquidating Trust shall be entitled to take all steps necessary on behalf of Aradigm to effectuate such dissolution. Upon the Effective Date of this Plan, the Responsible Individual and all acting officers, directors, employees, consultants, and professionals of Aradigm shall be discharged from such capacities.

(b) <u>Vesting of Property</u>. Upon confirmation of the Plan, all property of the estate shall vest in the Liquidating Trust free and clear of all claims and interests, except as provided in this Plan, pursuant to Bankruptcy Code Section 1141.

(c) <u>Plan Creates New Obligations</u>. The obligations that are provided in the confirmed Plan replace those obligations of Aradigm to creditors or shareholders that existed prior to the Effective Date of the Plan. The obligations under the confirmed Plan constitute binding

JMBM | Jeffer Mangels Butler & Mitchell LLP
67987881v2

contractual promises that, if not satisfied through performance of the Plan, create a basis for an action for breach of contract under California law. To the extent a creditor retains a lien under the Plan; that creditor retains all rights provided by such lien under applicable non-bankruptcy law, subject to the provisions hereof. The Liquidating Trust shall not have any liability to any creditors or other parties in interest other than to administer the assets that vest in the Liquidating Trust on and after the Effective Date and make the distributions expressly provided for in this Plan.

(d)    <u>Creditor Action Restrained</u>. The confirmed Plan is binding on every creditor and shareholder whose claims or interests are provided for in this Plan, whether or not such creditor or shareholder votes to accept this Plan, and a creditor or shareholder may not take any action to enforce any pre-confirmation obligation except as provided in this Plan.

(e)    <u>Effect of Conversion to Chapter 7</u>. If the case is at any time converted to one under Chapter 7: (i) all property of the estate as of the date of conversion, whether acquired pre-confirmation or post-confirmation, shall vest in the Chapter 7 bankruptcy estate; and (ii) all creditors, whether their claims arose pre-confirmation or post-confirmation, shall be prohibited from taking action against the Chapter 7 bankruptcy estate or property of the estate by Bankruptcy Code Section 362(a).

## PART 12
## CLAIMS RESERVED

The Trustee of the Liquidating Trust shall succeed to all of Aradigm's or the bankruptcy estate's rights against any third parties and all interests in any real or personal property, wherever located and by whomever possessed, whether arising from bankruptcy or non-bankruptcy law, including the following: causes of action; claims; counterclaims; defenses; rights of offset or recoupment; privileges; licenses; powers, rights and entitlements arising under contract, law or equity; objections to claims; objections to the validity, priority, amount, allowance or classification of any claim; rights to seek equitable or contractual subordination of claims; rights to avoid and recover prepetition or postpetition transfers (including but not limited to those arising under Bankruptcy Code Section 542, 543, 544, 545, 546, 547, 548, 549, 550, 551 and 553); claims related to taxes; rights to file tax returns and amended returns; rights to seek tax determinations,

JMBM | Jeffer Mangels Butler & Mitchell LLP

67987881v2

Case: 19-40363   Doc# 238   Filed: 06/08/20   Entered: 06/08/20 14:06:59   Page 37 of
33
DEBTOR'S MODIFIED COMBINED CHAPTER 11 PLAN AND DISCLOSURE STMNT (DTD JUNE 8, 2020)

including, without limitation, tax loss carryback claims, net operating loss claims, determinations of basis or depreciation, overpayment claims, offset and counterclaims; claims, causes of action and defenses against or with respect to financial institutions and any other person for the turnover of funds of, or due to, the estate; and claims, causes of action and defenses for coverage in or under any and all insurance policies of Aradigm, under which Aradigm is a beneficiary or against which Aradigm holds a claim (collectively, the "Reserved Claims").

Aradigm believes that there are not significant claims to avoid and recover prepetition transfers. As set forth in its Schedule of Financial Affairs, Aradigm made payments to its vendors during the 90 days prior to the Petition Date. In most case, those payments were made on a current basis in the ordinary course of Aradigm's business or the recipients extended new credit to Aradigm after the payment was made, which likely would provide a defense to any claims to recover the payments. Also as set forth in its Schedule of Financial Affairs, Aradigm made payments during the 90 days prior to the Petition Date to its employees for performance bonuses, retention bonuses, accrued vacation pay, and severance pay. These payments were made in the ordinary course of Aradigm's business. Furthermore, certain of the payments were required to be made by state employment law.

## PART 13
## RETENTION OF JURISDICTION

The Court shall retain jurisdiction: (a) to determine whether Aradigm has defaulted in performance of any obligation under this Plan; (b) to determine whether the time for performing any obligation should be extended; (c) to determine whether the case should be converted to one under Chapter 7, and proceedings following any such conversion; (d) to estimate the amount of any claim, to determine any and all objections to the validity, priority, amount or allowance of claims and to determine any motion, action or adversary proceeding concerning the classification or subordination of claims; (e) to determine the validity, priority, and amount of administrative priority claims, and any and all applications for allowance of compensation or reimbursement of expenses and any other fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code, this Plan or the Liquidating Trust Agreement; (f) to determine any and all

67987881v2

applications, motions, adversary proceedings, and contested or litigated matters arising in or related to the within case, whether pending before the Court on the date of confirmation or not, including, without limitation, avoidance actions under the Bankruptcy Code and other applicable law; (g) over any actions pertaining to any Reserved Claims; (h) to determine the extent, validity, priority or amount of any lien asserted against property of the estate; (i) to determine matters related to the collection, liquidation, realization upon and enforcement of rights regarding property of the estate or the Liquidating Trust; (j) to resolve any motion of the Trustee of the Liquidating Trust seeking instruction or approval of any matter affecting the administration of the Liquidating Trust; (k) to enforce, interpret, and modify the Plan, any agreement made under the Plan, or the order confirming the Plan; (l) to remedy any defect or omission, or to reconcile any inconsistency in the Plan, the order confirming the Plan or any other order of the Court; (m) to determine all controversies, suits, and disputes that may arise in connection with the interpretation, enforcement, implementation, consummation, or administration of the Plan or the order confirming the Plan; (n) to enter a final decree closing the within case and to reopen the Bankruptcy Case; (o) to determine such other matters as may arise in connection with the Plan or the order confirming the Plan and to issue orders regarding, and in furtherance of, execution and consummation of the Plan, the Liquidating Trust, and the order confirming the Plan; (p) to determine, as is necessary or appropriate under Bankruptcy Code Section 505 or otherwise, matters relating to tax returns filed or to be filed on behalf of the estate or the Liquidating Trust for all periods through the end of the fiscal year in which the within case is closed; (q) to hear and determine any disputes regarding assets of the estate or the Liquidating Trust, wherever located; (r) to hear and determine any disputes regarding the Liquidating Trust or the Trustee of the Liquidating Trust, and to authorize the Trustee of the Liquidating Trust to take actions consistent with the Plan or the order confirming the Plan; (s) to authorize and approve, or disapprove, any settlements or compromises of claims, causes of action, defenses, or controversies asserted by or against the estate, and the sale, lease or other disposition of property of the estate; (t) to enter orders confirming the appointment of a successor to or replacement of the Trustee of the Liquidating Trust; (u) to enter such orders as may be appropriate in the event the order confirming the Plan is for any reason

JMBM Jeffer Mangels Butler & Mitchell LLP

stayed, revoked, modified, rescinded or vacated; (v) to determine motions for the rejection; assumption, or assignment of executory contracts or unexpired leases filed before the Effective Date of the Plan and the allowance of any claims resulting therefrom; and (w) to issue and enforce injunctions, make determinations of declaratory relief, or take such other legal or equitable actions or issue such other orders as maybe necessary or appropriate to restrain interference with the Plan, the order confirming the Plan, any sale or other action provided under the Plan, the estate, the Liquidating Trust, the Trustee of the Liquidating Trust and any professional employed by Aradigm or the Trustee of the Liquidating Trust.

## PART 14
## GENERAL PROVISIONS

(a)  Effective Date of Plan. The effective date of the Plan shall be the first business day that is fourteen (14) days after the date of the entry of the order of confirmation, if no notice of appeal from that order has been filed (the "Effective Date"). If a notice of appeal has been filed, Aradigm may waive the finality requirement and put the plan into effect, unless the order confirming the Plan has been stayed. If a stay of the confirmation order has been issued, the Effective Date shall be the first business day after that date on which no stay of the confirmation order is in effect, provided that the confirmation order has not been vacated.

(b)  Plan Term. The term of this Plan shall be five years from the Effective Date of this Plan, unless extended by order of the Court. Aradigm anticipates that if FDA and/or EMA approval is obtained and the milestone payments earned, the Liquidating Trustee will seek to extend the term of the Plan and the Liquidating Trust for the ten year duration of the royalty term.

(c)  Cramdown. Pursuant to Bankruptcy Code Section 1129(b), Aradigm reserves the right to seek confirmation of the Plan notwithstanding the rejection of the Plan by one or more classes of creditors.

(d)  Severability. If any provision in the Plan is determined to be unenforceable, the determination shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

/ / /

67987881v2

Jeffer Mangels
Butler & Mitchell LLP
JMBM

(e) <u>Amendment</u>. This Plan may be altered, amended or modified by Aradigm before or after confirmation in the manner provided under Bankruptcy Code Section 1127. A holder of a claim that has accepted or rejected the Plan shall be deemed to have accepted or rejected, as the case may be, the Plan as altered, amended or modified, unless within the time fixed by the Court, such holder changes its previous acceptance or rejection by written notice served upon Aradigm.

(f) <u>Binding Effect</u>. The provisions of this Plan shall bind Aradigm, the Liquidating Trust, the Trustee of the Liquidating Trust, any person asserting a claim against or interest in Aradigm, the Liquidating Trust and any of the assets of the estate or the Liquidating Trust, whether or not the claim or interest is impaired under this Plan, whether or not the claim or interest is allowed, and whether or not the holder has accepted the Plan. The rights and obligations of any entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of the successors or assigns of such entity, including any chapter 7 or chapter 11 trustee.

(g) <u>Captions</u>. The heading contained in the Plan are for convenience of reference only and do not affect the meaning or interpretation of the Plan.

(h) <u>Controlling Effect</u>. Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of California govern the Plan and any agreements, documents, and instruments executed in connection with the Plan, except as otherwise provided in' the Plan.

(i) <u>Notices</u>. Any notice to Aradigm shall be in writing and mailed, and shall be deemed to have been given three days after the date sent by first class mail, postage prepaid and addressed as follows:

Aradigm Corporation
c/o Jeffer Mangels Butler & Mitchell LLP
Two Embarcadero Center, Suite 500
San Francisco, CA 94111
Attention: Bennett G. Young

Any notice to the Trustee of the Liquidating Trust shall be in writing and mailed, and shall be deemed to have been given three days after the date sent by first class mail, postage prepaid and addressed as follows:

/ / /

67987881v2

Aradigm Corporation Liquidating Trust
c/o Susan L. Uecker, Liquidating Trustee
Uecker & Associates, Inc.
1613 Lyon Street, Suite A
San Francisco, Ca 94115

(j)      <u>No Waiver of Claims</u>. Confirmation of this Plan effects no settlement, compromise, waiver or release of any claim or cause of action unless specifically provided in this Plan or the order confirming this Plan. The nondisclosure of any particular claim or cause of action, including, but not limited to, any of the Litigation Claims, shall not be construed as a settlement, compromise, waiver or release of such claims or cause of action.

DATED:  June 8, 2020                    JEFFER MANGELS BUTLER & MITCHELL LLP
                                        BENNETT G. YOUNG, ESQ.



                                        By:  /s/ Bennett G. Young
                                                BENNETT G. YOUNG
                                        Attorney for ARADIGM CORPORATION
                                        Debtor and Debtor-in-Possession

JMBM | Jeffer Mangels Butler & Mitchell LLP

67987881v2

# EXHIBIT A
# TO
# MODIFIED
# PLAN

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1                                              **EXHIBIT A**

2                               **ADDITIONAL BACKGROUND**

3   A.     **Aradigm's Efforts to Obtain Regulatory Approval of Its Drug Candidates Are**

4            **Unsuccessful**

5       Aradigm is a publicly traded emerging specialty pharmaceutical company focused on the

6 development and commercialization of products for the treatment and prevention of severe

7 respiratory diseases. Aradigm has concentrated on the development of inhaled drug delivery

8 technologies, particularly the development of respiratory drug delivery. Aradigm's lead product

9 candidates are proprietary formulations of the potent antibiotic ciprofloxacin that are delivered by

10 inhalation for the management of infections associated with the severe respiratory diseases of

11 cystic fibrosis, non-cystic fibrosis bronchiectasis ("NCFBE") or infections with non-tuberculous

12 mycobacteria ("NTM"). At the time it filed the Bankruptcy Case, Aradigm's assets included

13 patents, regulatory submissions, know-how and manufacturing know how, as well as other

14 intellectual property. Aradigm's intellectual property portfolio consisted of, among other things, 14

15 U.S. patents and 53 foreign patents.

16       Aradigm's inhaled ciprofloxacin formulation ("Ciprofloxacin DI") for the treatment of

17 NCFBE patients with chronic lung infection with *P. aeruginosa* completed two Phase 3 trials. In

18 July 2017, Aradigm submitted a New Drug Application ("NDA") to the FDA for Ciprofloxacin

19 DI. In January 2018, the FDA sent Aradigm a Complete Response Letter ("CRL") stating that it

20 cannot approve the NDA in its present form.

21       During the course of 2018 Aradigm had a meeting with the FDA to understand if a new

22 submission under the Limited Pathway for Antimicrobial Drugs would be possible. Aradigm

23 addressed all issues stated in the CRL and requested another meeting with the FDA. That meeting

24 was held on January 25, 2019. At that meeting, the FDA reiterated the position taken in the CRL

25 requesting that Aradigm conduct an additional Phase 3 trial. Aradigm estimated that a Phase 3 trial

26 would cost approximately $75 million and take at least three years to complete.

27       In March 2018, Aradigm submitted a marketing authorization application ("MAA") to the

28 European Medicines Agency ("EMA"), seeking approval for Ciprofloxacin DI for the treatment of

NCFBE patients with chronic lung infection with *P. aeruginosa.* Aradigm received the formal Day 180 List of Outstanding Issues ("LOI") from the EMA. Aradigm had contracted with an external service provider to perform studies and obtain additional data to address all outstanding issues and prepare and finalize its responses to the LOI. Due to circumstances that were out of the control of Aradigm, these studies were delayed at the service provider. Therefore, the EMA granted Aradigm an extension of the deadline to submit the responses to the LOI until 17 September, 2019. Aradigm submitted its responses on September 2, 2019, ahead of the deadline.

The EMA held an Oral Explanation for Aradigm on October 15, 2019 in front of the Committee for Medicinal Products for Human Use ("CHMP"), the decision making body for EMA, to address outstanding questions and substantiate Aradigm's request for conditional marketing authorization. Dr. Juergen Froehlich, Aradigm's acting Chief Medical Officer, attended that hearing on behalf of Aradigm. After the hearing, Aradigm received feedback that a negative opinion was likely to be received in November 2019 from the CHMP. As a result of the negative feedback, Aradigm withdrew the MAA.

### B.    Aradigm's Stock Is Delisted

Aradigm's stock is publicly traded. Prior to December 2018 the Debtor's stock was listed on the NASDAQ exchange. Aradigm viewed its NASDAQ listing as an important attribute. In February 2018 the NASDAQ notified Aradigm that the stock would be delisted because Aradigm had not maintained the minimum market value required by the NASDAQ's rules. In order to avoid delisting, in or about February 2018 Aradigm retained Wedbush Securities to seek a sale, merger, or financing of Aradigm.

Aradigm believed that its NASDAQ listing potentially was valuable to a merger partner as that partner could combine with Aradigm in a reverse merger and thereby become a NASDAQ listed public company. The principal focus of Wedbush's engagement therefore was to find a reverse merger partner for Aradigm. However, Wedbush was not successful at finding a reverse merger partner. Aradigm believed that its existing debt load to Grifols and to certain investment funds that were managed by First Eagle Investment Management, and which are now managed by Bleichroeder, L.P. ("Bleichroeder"), was a major impediment to any transaction.

JMBM | Jeffer Mangels Butler & Mitchell LLP

## C. The Debtor's Capital Structure

Aradigm has limited operating income and relies on investor capital to fund its operations and its research, development and regulatory efforts. Aradigm's principal investors are Grifols and the investment funds managed by Bleichroeder. Grifols is Aradigm's largest shareholder, holding approximately 48% of Aradigm's stock, and its largest creditor, with a claim based on notes and convertible notes of approximately $32 million. Bleichroeder is Aradigm's second largest shareholder, holding through the investment funds it manages approximately 26% of Aradigm's stock, and its second largest creditor, with a claim based on notes and convertible notes of approximately $4.4 million.

In addition, Grifols and Aradigm are parties to a License and Collaboration Agreement (the "Grifols License"). In broad terms, the Grifols License distinguishes between the right to pursue regulatory approval of Aradigm's inhaled liposomal ciprofloxacin formulations, Aradigm's intellectual property, and the right to manufacture the product, on the one hand, and the right to commercialize the product once approved on the other. In the Grifols License, Aradigm granted to Grifols an exclusive worldwide license to commercialize the product as well as all liposomal ciprofloxacin products for various indications, in return for milestone payments and a royalty stream once the product was commercialized, while Aradigm retained ownership of the intellectual property and the exclusive right to pursue regulatory approval and to manufacture the product. Thus, Grifols controls the commercial rights to the product, while Aradigm controls the development and owns the underlying intellectual property.

JMBM | Jeffer Mangels Butler & Mitchell LLP

6798788lv2

# Exhibit B
# To Modified
# Plan

# LIQUIDATING TRUST AGREEMENT

This Liquidating Trust Agreement (the "Trust Agreement"), by and among ARADIGM CORPORATION, Debtor-in-Possession in Case Number 19-40363-WJL pending before the United States Bankruptcy Court for the Northern District of California (the "Debtor") and Susan L. Uecker, as trustee of the Liquidating Trust ("Trustee"), executed in connection with the Combined Chapter 11 Plan and Disclosure Statement (Dated April 27, 2020), as the same may be amended (the "Plan"), which provides for the establishment of a liquidating trust evidenced hereby (the "Liquidating Trust") to resolve, liquidate and realize upon the assets, rights of action and such other claims and property transferred to it by the Debtor pursuant to the Plan, as successor to and representative of the estate of the Debtor. Except with respect to the terms defined herein, all capitalized terms contained herein shall have the meanings ascribed to them in the Plan.

## RECITALS

WHEREAS, the Liquidating Trust is created pursuant to, and to effectuate, the Plan;

WHEREAS, the Liquidating Trust is created on behalf of, and for the benefit of, the holders of allowed Class 2 claims and allowed Class 3 interests;

WHEREAS, the Liquidating Trust is established for the sole purpose of liquidating its assets for the benefit of the holders of allowed Class 2 claims and, after payment in full of the allowed Class 2 claims, plus interest, allowed Class 3 interests and distributing the proceeds to the beneficiaries of the Trust, pursuant to the Plan, in accordance with Treasury Regulations Section 301.7701-4(d) references to Treasury Regulations, herein, shall refer to Title 26 of the Code of Federal Regulations), with no objective or authority to continue or engage in the conduct of a trade or business:

WHEREAS, the Liquidating Trust is intended to qualify as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d); and

WHEREAS, any reference herein to a holder of an interest in the Liquidating Trust means a holder recorded on the official register maintained by the Trustee (the "Register") and shall not mean any beneficial owner not recorded on such official registry.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein and in the Plan, the Debtor, the Committee and the Trustee agree as follows:

1.   ESTABLISHMENT OF THE LIQUIDATING TRUST

   1.1   Transfer of Property to Trustee; Assignment and Assumption of Claims.

      a.   Pursuant to the Plan, the Liquidating Trust is hereby established on behalf, and for the benefit, of holders of allowed Class 2 claims and, after payment in full of the allowed Class 2 claims, plus interest, allowed Class 3 interests (whether allowed on or after the Effective Date). Upon the Effective Date of the Plan, the Debtor shall transfer, assign, and deliver to the

Trustee all of its right, title. and interest in each and every asset of the estate free and clear of any lien, claim or interest in such property of any other person or entity ("the Trust Assets"). The Trustee agrees to accept and hold the Trust Assets in trust on behalf, and for the benefit, of the holders of the allowed Class 2 claims and, after payment in full of the allowed Class 2 claims, plus interest, allowed Class 3 interests (whether allowed on or after the Effective Date), subject to the terms of this Trust Agreement. Upon the transfer of the Trust Assets, the Trustee shall succeed to all of the Debtor's right, title and interest in the Trust Assets and the Debtor will have no further interest in or with respect to the Trust Assets or this Liquidating Trust.

        b.      The Debtor hereby transfers and assigns the Trust Assets to the Trustee, and the Trustee on behalf, and for the benefit, of the liquidating Trust hereby assumes and agrees that all such Trust Assets will be transferred to the Liquidating Trust subject to the following liabilities, if any: (i) any expenses incurred and unpaid, or to be incurred, by the Trustee in the performance of his or her duties (including, without limitation, the filing of any tax returns and the payment of any taxes shown thereon, and any tax liability determined to be due and owing pursuant to requests for expedited determinations under Section 505 of the Bankruptcy Code); and (ii) any obligations owing pursuant to the Plan and unpaid (including, without limitation, obligations incurred before the Effective Date); but specifically excluding any claims which have been barred or discharged pursuant to the Plan.

        c.      The Trustee shall be entitled to transfer to the Trust any and all assets of the Debtor or its estate and to execute and record any agreements, documents and instruments necessary to effectuate such transfer, in the Trustee's own name, on behalf of the Debtor or its estate.

    1.2    <u>Treatment of Transfer of Trust Assets</u>. As provided in the Plan, the Trust Assets will be treated by all parties (including, without limitation, the Debtor, the Trustee and the holders of allowed Class 2 claims and allowed Class 3 interests) for tax purposes as being transferred (subject to the liabilities specified) by the Debtor to the holders of allowed Class 2 claims and, after payment in full of the allowed Class 2 claims, plus interest, allowed Class 3 interests (with each such holder receiving an undivided interest therein pro rata in proportion to all allowed Class 2 claims and, after payment in full of the allowed Class 2 claims, plus interest, allowed Class 3 interests), and then by such holders to the Liquidating Trust in exchange for interests in the Trust for the benefit of such holders (the "Liquidating Trust Interests"), in accordance with the Plan.

    1.3    <u>Trustee</u>. The Trustee shall be Susan L. Uecker, and any successor trustee appointed hereunder.

    1.4    <u>Ownership by Trustee</u>. The Trustee shall promptly record or register in her name as trustee, or in the name or names of any nominee or person, in accordance with the terms thereof, ownership of all Trust Assets received by her as Trustee and comply with all provisions of law that may bear on the evidencing of ownership of and title to any portion of the Trust Assets as are necessary and appropriate and that the Trustee determines are in the best interests of the Liquidating Trust. The Trustee shall use a custodian (such as a qualified bank or a company that is a member of a national securities exchange) to maintain the cash, securities and similar investments of the Liquidating Trust.

2

1.5     Name. The Liquidating Trust shall be named and known as the Aradigm Corporation Liquidating Trust.

2.     LIQUIDATING TRUST INTERESTS

2.1     Identification of Holders of Liquidating Trust Interests. The record holders of Liquidating Trust Interests shall be the holders of allowed Class 2 claims and allowed Class 3 interests, and shall be recorded and set forth in the Register expressly for such purpose. All references in this Trust Agreement to holders shall be read to mean holders of record as set forth in the Register and shall not mean any beneficial owner not recorded on the Register. The Liquidating Trust Interests shall not be evidenced by certificates.

2.2     Transferability of Liquidating Trust Interests. Subject to compliance with applicable law, the Liquidating Trust Interests are transferable upon written notice to the Trustee, provided, however, that neither the Liquidating Trust nor the Trustee shall take any steps, directly or indirectly, to facilitate the development of a secondary market in the Liquidating Trust Interests, including without limitation (i) listing the Liquidating Trust Interests on any national securities exchange or on the NASDAQ Stock Market, (ii) placing advertisements designed to facilitate the transfer of the Liquidating Trust Interests, (iii) distributing marketing materials regarding the Liquidating Trust Interests or (iv) collecting or publishing information regarding prices at which the Liquidating Trust Interests may be transferred.

2.3     Holders of Liquidating Trust Interests Have No Rights in Connection with Administration of the Liquidating Trust. Except as provided in the Plan, this Trust Agreement grants exclusive authority over administration of the Liquidating Trust to the Trustee; accordingly, the holders of Liquidating Trust Interests have no voting rights and no rights to administer the Liquidating Trust.

3.     PURPOSE, AUTHORITY, LIMITATIONS, DISTRIBUTIONS AND DUTIES

3.1     Purpose of the Liquidating Trust. The Liquidating Trust shall be established for the purpose of implementation of the Plan by liquidating the Trust Assets and distributing the proceeds to holders of Liquidating Trust Interests, in accordance with Treasury Regulations Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. Accordingly, the Trustee shall, in an expeditious but orderly manner, liquidate and convert to cash the Trust Assets of the Liquidating Trust, make timely distributions and not unduly prolong the duration of the Liquidating Trust. The liquidation of the Trust Assets may be accomplished either through the sale of Trust Assets (in whole or in combination), including the sale of any rights of action, or through the prosecution or settlement of any rights of action, or otherwise.

3.2     Authority of Trustee. In connection with the administration of the Liquidating Trust, except as set forth in this Trust Agreement or the Plan, the Trustee is authorized to perform any and all acts necessary or desirable to accomplish the purposes of the Liquidating Trust. Except as otherwise provided in the Plan, nothing in this Trust Agreement shall require the Trustee to file any accounting or seek approval of any court with respect to the administration of the Liquidating Trust, or as a condition for managing any payment or distribution out of the

3

67763086v10

Trust Assets, although the Trustee may seek approval of the Bankruptcy Court for any such action. Without limitation, but subject to the foregoing, the Trustee shall be expressly authorized to:

a. hold legal title to any and all rights of the holders of the Liquidating Trust Interests in or arising from the Trust Assets, including but not limited to, collecting, receiving any and all money and other property belonging to the Liquidating Trust and the right to vote any claim or interest in a case under the Bankruptcy Code and receive any distribution therein; provided, however, the Trustee shall have the power to cause legal title (or evidence of title) to any of the Trust Assets to be held by any nominee, on such terms and in such manner as the Trustee may determine;

b. perform the duties, exercise the powers, and assert the rights of a trustee under Sections 704, 108 and 1106 of the Bankruptcy Code and be a representative of the Estates for purposes of Section 1123 of the Bankruptcy Code, including, without limitation, commencing, prosecuting or settling Reserved Claims, enforcing contracts, and asserting claims, defenses, offsets and privileges;

c. protect and enforce the rights to the Trust Assets by any necessary or appropriate means, including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

d. compromise, adjust, arbitrate, sue on or defend, pursue, prosecute, file, abandon, settle or otherwise resolve, claims and rights of action in favor of or against the Debtor, the estate, the Liquidating Trust and the Trustee, including those based upon Sections 544, 547, 548, 549, 550, 551 or 553(b) of the Bankruptcy Code, as the Trustee shall deem advisable, and to take any and all actions necessary or appropriate to the foregoing;

e. avoid and recover transfers of the Debtor's property as may be permitted by the Bankruptcy Code or applicable state law, including, without limitation, those identified in the Disclosure Statement;

f. determine and satisfy any and all liabilities created, incurred or assumed by the Liquidating Trust;

g. file all tax and information returns with respect to the Liquidating Trust and pay taxes properly payable by the Liquidating Trust, if any, including income taxes and employment taxes;

h. exercise any and all rights afforded a debtor under Section 505 of the Bankruptcy Code to request a prompt determination of the state and federal tax liabilities of the Debtors, whether such liabilities were incurred prior to the Petition Date or during the pendency of the Debtor's Chapter 11 Case;

i. execute offsets against claims as provided for in the Plan;

4

67763086v10

j.       assert or waive any privilege or defense on behalf of the Liquidating Trust or the Debtor;

k.       pay any expense incurred by the Liquidating Trust or the Trustee in the course of administering the Liquidating Trust;

l.       pay any fees and reimburse the expenses of any professionals or employees employed by the Debtor;

m.       at the expense of the Liquidating Trust, obtain insurance coverage with respect to the liabilities and obligations of the Trustee under this Trust Agreement (in the form of an errors and omissions policy or otherwise);

n.       obtain insurance coverage with respect to real and personal property which may become Trust Assets, if any;

o.       retain and pay legal counsel to the Liquidating Trust to aid in the administration of the Trust, to prosecute or defend any claims or rights of action that constitute the Trust Assets, and to perform such other functions as may be appropriate. The Trustee may commit the Liquidating Trust to indemnify any such parties in connection with the performance of services. A law firm or attorney shall not be disqualified from serving as counsel to the Liquidating Trust solely because of its prior retention by the Debtor;

p.       retain and pay one or more public accounting firms or public accountants to perform such reviews and/or audits of the financial books and records of the Liquidating Trust as may be appropriate and to prepare and file any tax returns or information returns for the Liquidating Trust as may be required. The Trustee may commit the Liquidating Trust to indemnify any such parties in connection with the performance of services. A public accounting firm or public accountant shall not be disqualified from serving as accountant to the Liquidating Trust solely because of its prior retention by the Debtor;

q.       retain and pay professionals to assist the Trustee in carrying out the powers and duties of the Trustee under this Trust Agreement. The Trustee may commit the Liquidating Trust to indemnify any such parties in connection with the performance of services. A professional shall not be disqualified from rendering services on behalf of the Liquidating 'trust solely because of its prior retention by the Debtor;

r.       employ one or more employees to assist the Trustee in carrying out the powers and duties of the Trustee under this Trust Agreement. The Trustee may commit the Liquidating Trust to, and shall pay, all such employees compensation, wages or salary in the amounts he or she shall determine to be appropriate. If the Trustee employs employees pursuant to this Section, the Trustee shall establish payroll procedures and pay any and all federal, state or local tax withholding required under applicable law with respect to any such employees, obtain worker's compensation insurance and take all other actions he or she deems necessary or appropriate to effectuate the provisions of this Section, including establishing and adopting or ceasing to provide any employee benefits;

s.      invest any moneys held as part of the Liquidating Trust in accordance with the terms of Section 4.6 hereof, limited to such investments that are consistent with the Liquidating Trust's status as a liquidating trust within the meaning of Treasury Regulations Section 301.7701-4(d);

t.      request any appropriate tax determination with respect to the Liquidating Trust, including, without limitation, a determination pursuant to Section 505 of the Bankruptcy Code;

u.      seek the examination of any entity under, and subject to, the provisions of Bankruptcy Rule 2004;

v.      seek estimation of contingent or unliquidated claim under Section 502(c) of the Bankruptcy Code;

w.      sell, auction, lease, rent, encumber or transfer any Trust Assets, consistent with the purposes of the Liquidating Trust as the Trustee shall deem advisable, and to take any and all actions necessary or appropriate to accomplish the foregoing; provided that the Trustee shall give notice and opportunity for hearing to the Office of the United States Trustee and all parties requesting special notice in connection with sales of Trust Assets, unless otherwise ordered by the Bankruptcy Court;

x.      except as otherwise provided in the Plan, abandon any Trust Assets that cannot be sold or otherwise disposed of for value and whose distribution to holders of Liquidating Trust Interests would not be feasible or cost-effective based on the judgment and discretion of the Trustee;

y.      file with the Bankruptcy Court the reports and other documents required by the Plan or otherwise required to close the Chapter 11 Case;

z.      appear in, defend, or otherwise be heard as a party in interest in (i) appeals from the order confirming the Plan and any proceedings related thereto; (ii) proceedings related to the enforcement or interpretation of the Plan or the Liquidating Trust Agreement; (iii) proceedings related to modifications or amendments to the Plan or the Liquidating Trust Agreement; (iv) proceedings related to the establishment and administration of the Liquidating Trust; and (v) proceedings related to the allowance of claims for compensation or expenses of counsel, accountants, professionals or employees employed by the Debtor, the estate, the Trustee or the Liquidating Trust;

aa.      file motions with the Bankruptcy Court seeking instruction or approval of any matter affecting the administration of the Liquidating Trust;

bb.      take or refrain from taking any and all actions the Trustee reasonably deems necessary for the continuation, protection and maximization of the Trust Assets or to carry out the purposes hereof; and

6

67763086v10

cc.     retain and employ any professionals or employees, as provided herein, without approval of the Bankruptcy Court.

3.3     <u>Limitation of Trustee's Authority</u>.

a.     Notwithstanding anything herein to the contrary, the Trustee shall not engage in any trade or business, shall not take actions inconsistent with the orderly liquidation of the Trust Assets and distributions to beneficiaries as are required by applicable law, and shall not take actions inconsistent with the Plan. Notwithstanding any provisions hereof, the Trustee is not authorized to engage in any investments or activities inconsistent with the treatment of the Liquidating Trust as a liquidating trust within the meaning of Treasury Regulations Section 301.7701-4(d).

b.     The Trustee shall not commingle any of the Trust Assets with his or her own property or the property of any other person.

c.     Neither the Liquidating Trust nor the Trustee shall take any action that would result in the Liquidating Trust becoming subject to registration as an "investment company" pursuant to the Investment Company Act of 1940, as amended.

d.     The rights and powers of the Trustee, including payment of compensation and reimbursement of expenses for the Trustee or any professionals or employees employed by the Trustee, shall be limited to the extent, and in the manner provided in, the Plan.

e.     The Liquidating Trustee shall report to Bleichroeder, L.P.

3.4     <u>Books and Records</u>. The Trustee shall maintain in respect of the Liquidating Trust and the holders of Liquidating Trust Interests books and records relating to the Trust Assets and income of the liquidating Trust and the payment of expenses of, and liabilities of claims against or assumed by, the Liquidating Trust in such detail and for such period of time as may be necessary to enable him or her to make full and proper accounting in respect thereof. A holder of a Liquidating Trust Interest may obtain information relating to the management of the Trust Assets for purposes reasonably related to such holder's interests as holder as long as access is reasonably exercised during normal business hours, after at least ten (10) business days' written notice to the Trustee, does not constitute an undue burden on the Trustee, and is not detrimental to the Liquidating Trust. The Trustee may require, to the extent he or she deems it necessary or appropriate, that any holder requesting information enter into a confidentiality agreement satisfactory in form and substance to the Trustee prior to obtaining any information. Nothing in this Trust Agreement provides any holder with a right to review, inspect, seek discovery of or otherwise obtain any information that is privileged or subject to a third party's rights of privacy or confidentiality.

3.5     <u>Additional Powers</u>. Except as otherwise set forth in this Trust Agreement or in the Plan, and subject to the Treasury Regulations governing liquidating trusts and the retained jurisdiction of the Bankruptcy Court as provided for in the Plan, but without prior or further authorization, the Trustee may control and exercise authority over the Trust Assets and over the protection, conservation and disposition thereof.

7

3.6    Distributions; Withholding.

a.      The Trustee shall make the distribution to holders of allowed class 1 claims as and when required by Part 3 of the Plan.

b.      The Trustee shall distribute at least annually pro rata to the holders of allowed class 2 claims, and, after payment in full of the allowed class 2 claims, plus interest, to holders of allowed class 3 interests in accordance with each such Class 3 interest holder's pro rata portion of all of the Class 3 interests in the Liquidating Trust, provided that any such distribution is not unduly burdensome, in accordance with such holders' relative beneficial interests in the Liquidating Trust, all of its net income plus all net proceeds from the sale of assets; provided, however, that any such distribution shall only be made if (i) an amount based on the Trustee's good faith estimate of the cost necessary to complete the Liquidating Trust's obligations under the Plan and the Liquidating Trust Agreement, including professional fees of the Liquidating Trust, is deemed by the Trustee, in the Trustee's sole discretion, to be sufficient; and (ii) the Trustee retains amounts reasonably necessary to meet contingent liabilities, to maintain the value of the Liquidating Trust assets during liquidation, and to satisfy other liabilities or expenses incurred by the Liquidating Trust in accordance with the Plan or this Trust Agreement.

c.      In the event the Liquidating Trust receives funds on account of the Milestone Payments or the Royalty Payments under the Plan in any calendar year, at least once during such calendar year, the Trustee shall distribute any and all remaining net income of the Liquidating Trust (including for the avoidance of doubt, any and all net proceeds from the sale of any Trust Assets) in the following order: first pro rata to holders of allowed Class 2 claims and, after payment in full of the Class 2 claims (including the payment of any accrued and unpaid interest thereon), then to the holders of allowed Class 3 interests in accordance with each such Class 3 interest holder's pro rata portion of all of the Class 3 interests in the Liquidating Trust, in each case, as promptly as reasonably possible; provided, however, that any such distribution shall only be made if immediately following any such distribution (i) the Liquidating Trust retains at least an amount equal to the reasonable estimated cost of the Liquidating Trust's compliance with the terms, conditions, and obligations under the Plan and this Trust Agreement, including without limitation, any professional fees of the Liquidating Trust (such reasonable estimated cost to be determined by the Trustee in good faith in his, her or its sole and reasonable discretion), and (ii) the Liquidating Trust retains at least an amount reasonably necessary (such amount to be estimated by the Trustee in good faith in his, her or its sole and reasonable discretion) (a) to meet any and all contingent liabilities of the Liquidating Trust, (b) to maintain the value of the Trust Assets during liquidation, and (c) to satisfy any and all other liabilities or expenses incurred by the Liquidating Trust in accordance with the Plan or this Trust Agreement. In the event of a liquidation of all assets of the Liquidating Trust, including the Trust Assets, the Trustee shall also make distributions first pro rata to holders of allowed Class 2 claims and, after payment in full of the allowed Class 2 claims (including the payment of any accrued and unpaid interest thereon), then to the holders of allowed Class 3 interests in accordance with each such Class 3 interest holder's pro rata portion of all of the Class 3 interests in the Liquidating Trust, in each case, as promptly as reasonably possible. The Trustee shall be entitled to, but shall not be required to, make additional interim distributions, first pro rata to the holders of allowed Class 2

8

claims and, after payment in full of the allowed Class 2 claims (including the payment of any accrued but unpaid interest thereon), then to the holders of allowed Class 3 interests in accordance with each such Class 3 interest holder's pro rata portion of all of the Class 3 interests in the Liquidating Trust, in each case, as and when the Trustee reasonably determines, in the exercise of the Trustee's sole discretion, that the Liquidating Trust has sufficient funds to justify the cost and expense of making any such distributions. The Trustee shall be entitled to withhold any and all amounts that the Trustee reasonably determines are required to be withheld by any law, regulation, rule, ruling, order, directive or other governmental request.

   3.7 <u>Reporting by the</u> Trustee.

     a. <u>Federal Income Tax</u>. Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the Trustee of a private letter ruling if the Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Trustee), the Trustee shall file returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a).

     b. <u>Other Reporting</u>. The Trustee shall file (or cause to be filed) any other statements, returns or disclosures relating to the Liquidating Trust that are required by any governmental authority.

   3.8 <u>Compliance with Laws</u>. Any and all distributions of Trust Assets and proceeds of borrowings, if any, shall be in compliance with applicable laws, including, but not limited to, applicable federal and state securities laws.

## 4. <u>THE TRUSTEE OF THE LIQUIDATING TRUST</u>

   4.1 <u>Generally</u>. The Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purposes of this Liquidating Trust and not otherwise, except that the Trustee may deal with the Trust Assets as permitted herein.

   4.2 <u>Responsibilities of Trustee</u>. The Trustee shall, in an expeditious but orderly manner, liquidate and convert to cash the Trust Assets, make timely distributions and not unduly prolong the duration of the Liquidating Trust. In so doing, the Trustee shall exercise reasonable business judgment in liquidating the Trust Assets. The liquidation of the Trust Assets may be accomplished through the sale or transfer of Trust Assets (in whole or in combination), including the sale of any right of action or through the prosecution or settlement of any or all rights of action, or otherwise. In connection therewith, the Trustee shall have the power to (a) prosecute for the benefit of the Liquidating Trust all claims, rights and rights of action transferred, or assigned or contributed, to the Liquidating Trust whether or not such suits are brought in the name of the Liquidating Trust, the Trustee, the Debtor, the estate or otherwise for the benefit of the holders of Liquidating Trust Interests, (b) liquidate the Trust Assets, such as through the sale of assets (in whole or in combination thereof), and (c) otherwise perform the functions and take the actions permitted or required by the Plan, under applicable law, pursuant to this Trust Agreement or in any other agreement executed by the Trustee. Any and all proceeds generated from the Trust Assets shall be the property of the Liquidating Trust. Notwithstanding the

9

67763086v10

foregoing, the Trustee shall not sell or compromise the right to receive the future Milestone Payments or the Royalty Payments without the consent of Bleichroeder or the approval of the Bankruptcy Court.

4.3     Standard of Care; Indemnification, Exculpation.

a.      None of the Trustee or the attorneys, accountants, professionals, employees or any other duly designated agent or representative of the Trustee shall be liable for any act or omission taken or omitted to be taken in the capacity of Trustee or attorney, accountant, professional, employee or other agent or representative of the Liquidating Trust, other than acts or omissions resulting from willful misconduct, gross negligence or fraud.

b.      The Trustee may, in connection with the performance of his or her functions, and in his or her sole discretion, consult with his or her attorneys, accountants and professionals, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons. Notwithstanding such authority, the Trustee shall not be under any obligation to consult with his or her attorneys, accountants or professionals, and their determinations shall not result in the imposition of liability upon the Trustee.

c.      The Liquidating Trust shall indemnify and hold harmless the Trustee (and his or her successors) and the Trustee's attorneys, accountants, professionals, employees and all duly designated agents and representatives of the Trustee or the Liquidating Trust (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorney's fees and costs arising out of or due to their actions or omissions, or consequences of their ,actions or omissions with respect to the Liquidating Trust or the implementation or administration of the Liquidating Trust; provided, however, that no such indemnification will be made to such persons for actions or omissions as a result of willful misconduct, gross negligence or fraud.

d.      If Trustee becomes involved in any action, proceeding, or investigation in connection with any matter arising out of or in connection with this Trust Agreement or the affairs of the Liquidating Trust, the Liquidating Trust shall periodically advance or otherwise reimburse on demand the Trustee's reasonable legal and other expenses (including, without limitation, the cost of any investigation, and attorney's fees, disbursements, and related expenses) incurred in connection therewith, but the Trustee shall be required to repay promptly to the Liquidating Trust the amount of any such advanced or reimbursed expenses paid to the Trustee to the extent that it shall be ultimately determined that the Trustee engaged in fraud, willful misconduct, or gross negligence in connection with the affairs of the Liquidating Trust with respect to which such expenses were paid. The Liquidating Trust may indemnify and hold harmless the attorneys, accountants, professionals, employees and agents of the Liquidating Trust to the same extent as provided herein.

e.      The provisions of this Section shall remain available to and be binding on any former Trustee or the estate of any deceased Trustee. and to any successor Trustee.

Case: 19-40363   Doc# 235-2   Filed: 06/02/2020   Entered: 06/02/2020 14:06:38   Page 57 of 64
67763086v10

f. The Trustee shall only be entitled to indemnification from the Liquidating Trust under this Section to the extent that it is not covered by insurance, if any,

4.4 <u>Reliance by Trustee</u>. The Trustee may rely, and shall be fully protected in acting or refraining from acting, on any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document that the Trustee has no reason to believe to be other than genuine and to have been signed or presented by the proper party or parties or, in the case of facsimiles or e-mails to have been sent by the proper party or parties, and the Trustee may conclusively rely as to the truth of the statements and correctness of the opinions expressed therein. The Trustee may consult with counsel, and any opinion of counsel shall be full and complete authorization and protection in respect to any action taken or suffered by the Trustee in accordance therewith.

4.5 <u>Reliance by Persons Dealing With the Trust</u>. In the absence of actual knowledge to the contrary, any person dealing with the Liquidating Trust shall be entitled to rely on the authority of the Trustee to act in connection with the acquisition, management, or disposition of Trust Assets and shall have no obligation to inquire into the existence of such authority.

4.6 <u>Investment and Safekeeping of Trust Assets</u>. Cash held pending distribution shall, to the extent permitted by applicable law, be invested by the Trustee in (a) direct obligations of, or obligations guaranteed by, the United States of America (including, without limitation United States Treasury Bills); (b) obligations of any agency or corporation that is or may hereafter be created by or pursuant to an Act of the Congress of the United States as an agency or instrumentality thereof: or (c) demand deposits or short-term certificates of deposit at any bank or trust company that the Trustee deems appropriate. The scope of any such permissible investments shall be limited to include only those investments, or shall be expanded to include any additional investments, as the case may be, that a liquidating trust, within the meaning of Treasury Regulations Section 301.7701-4(d) may be permitted to hold, pursuant to any amendment or addition to the Internal Revenue Code or to the Treasury, Regulations, or any modification in IRS guidelines whether set forth in IRS rulings, other IRS pronouncements, or otherwise.

4.7 <u>Expense Reimbursement and Compensation</u>.

a. The Trust Assets shall be subject to the claims of the Trustee, and the Trustee shall be entitled to reimbursement out of any available cash in the Liquidating Trust for his, her or its actual, necessary out-of-pocket expenses and against and from any and all loss, liability, or damage which the Trustee actually sustains in good faith and without misconduct, negligence, or fraud in the exercise and performance of any of the powers and duties under this Trust Agreement. As compensation for the performance of his, her or its duties, the Trustee and his, her or its employees shall be compensated for actual and necessary services rendered at the following initial hourly rates:

11

| Susan L. Uecker | $450 |
| Project Manager | $225 |
| Accounting | $100 |
| Staff | $50 |

The Trustee shall maintain billing statements for all actual and necessary services or expenses for which the Trustee or his, her or its employees receive compensation or reimbursement. No more than once per calendar year, the Trustee may increase said compensation upon ten (10) days' notice served by mail upon the holders listed in the Register without approval of the Bankruptcy Court, provided that any such annual increase in compensation shall not exceed five percent (5%).

b.      Upon the request of either a holder of an allowed Class 2 claim or a holder of an allowed Class 3 interest, within ten (10) business days following the Trustee's receipt of any such request, the Trustee shall make available all billing statements concerning (1) the actual and necessary services that the Trustee and his, her or its employees were compensated for, and (2) the actual and necessary expenses for which the Trustee received reimbursement.

c.      If the cash in the Liquidating Trust is at any time insufficient to compensate and reimburse the Trustee, including any professionals and other third parties retained by the Trustee, for any amounts to which they are entitled hereunder and if the Trustee shall be unable to borrow funds sufficient for such compensation and reimbursement in accordance with the terms of this Trust Agreement, then the Trustee may reduce to cash that portion of the Trust Assets necessary so as to effect such compensation and reimbursement.

4.8      Bond. The Trustee shall serve without bond.

4.9      Confidentiality. The Trustee shall, while serving as Trustee under this Trust Agreement following the termination of this Trust Agreement or following the earlier of his, her, or its removal or resignation hereunder, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any entity to which any of the Trust Assets relates or of which he, she, or it has become aware in his, her, or its capacity as Trustee.

5.      SUCCESSOR LIQUIDATING TRUSTEE

5.1      Resignation. The Trustee may resign by giving not less than ninety (90) days' prior written notice of the proposed effective date of resignation to Bleichroeder and by filing a copy of such notice with the Bankruptcy Court. If the Trustee resigns, Bleichroeder shall be authorized to appoint a successor Trustee with the approval of the Bankruptcy Court. The Trustee shall continue to serve as the Trustee after notice of resignation until the proposed effective date unless Bleichroeder otherwise determines or consents to an earlier effective date, which shall be the date that appointment of a successor Trustee becomes effective.

12

67763086v10

5.2    Removal. The Trustee may be removed by the Bankruptcy Court for Cause and upon reasonable notice. "Cause" means (i) fraud, willful misconduct or gross negligence in connection with the affairs of the Liquidating Trust, (ii) such physical or mental disability as substantially prevents the Trustee from performing his or her duties as Trustee hereunder, or (iii) breach of a fiduciary duty or an unresolved material conflict of interest. If removed, the Trustee shall be replaced by Bleichroeder, with the approval of the Bankruptcy Court, within a reasonable time.

5.3    Acceptance of Appointment by Successor Trustee. Any successor Trustee appointed hereunder shall execute and file with the Bankruptcy Court an instrument accepting such appointment in form satisfactory to the successor Trustee. Thereupon, such successor Trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts and duties of his or her predecessor in the Liquidating Trust with like effect as if originally named herein; provided, however, that a removed or resigning Trustee shall, nevertheless, when requested in writing by the successor Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Trustee under the Liquidating Trust all the estates, properties, rights, powers, and trusts of such predecessor Trustee.

5.4    Continuance of Trust. The death, resignation, or removal of the Trustee shall not operate to terminate the Liquidating Trust created by this Agreement or revoke any existing agency (other than the agency of the former Trustee as Trustee) created pursuant to the term of this Trust Agreement or invalidate any action taken by the Trustee. The Trustee agrees that the provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Trustee and the Trustee's heirs, legal and personal representatives, successors or assigns, as the case may be. In the event of the resignation or removal of the Trustee, the Trustee shall promptly (i) execute and deliver by the effective date of resignation or removal such documents, instruments, and other writings as may be reasonably requested by the successor Trustee to effect the termination of the resigning or removed Trustee's capacity under this Trust Agreement and the conveyance of the Trust Assets then held by the resigning or removed Trustee to the successor Trustee; (ii) deliver to the successor Trustee all documents, instruments, records, and other writings relating to the Liquidating Trust as may be in the possession or under the control of the resigning or removed Trustee; and (iii) otherwise assist and cooperate in effecting the assumption of the resigning or removed Trustee's obligations and functions by the successor Trustee. The resigning or removed Trustee hereby irrevocably appoints the successor Trustee as attorney-in-fact and agent with full power of substitution and in his or her name, place and stead to do any and all such acts that such resigning or removed Trustee is obligated to perform under this Section. Such appointment shall not be affected by the subsequent disability or incompetence of the Trustee making such appointment.

6.    REPORTS TO HOLDERS OF LIQUIDATING TRUST INTERESTS

6.1    Securities Laws Reporting. Under section 1145 of the Bankruptcy Code, the issuance of Liquidating Trust Interests under the Plan shall be exempt from registration under the Securities Act of 1933, as amended, and applicable state and local laws requiring registration of securities, if applicable. If the Trustee determines that the Liquidating Trust is required to comply with the registration and reporting or other requirements of the Securities and Exchange

13

Act of 1934 as amended, or the Investment Company Act of 1940, as amended, then the Trustee shall take any and all actions to comply with, or qualify for exemption from, such reporting or other requirements and to file periodic reports with the Securities and Exchange Commission as necessary.

6.2  <u>Tax Reporting</u>. Promptly following the end of each calendar year, the Trustee shall submit to each holder of a Liquidating Trust Interest appearing on the Register during such year a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct all such holders to report such items on their federal income tax returns. Allocations of Liquidating Trust taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein or in the Plan or Disclosure Statement) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the holders of Liquidating Trust Interests, taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in, which an economic loss would he borne immediately after a liquidating distribution of the remaining Trust Assets. For this purpose, the tax book value of the Trust Assets shall equal their fair market value on the Effective Date or, if later, the date such assets were acquired by the Liquidating Trust, adjusted in either case in accordance with tax accounting principles prescribed by the Internal Revenue Code of 1986, as amended, the Treasury Regulations and other applicable administrative and judicial authorities and pronouncements. For the avoidance of doubt, the taxable income and the taxable losses of the Liquidating Trust shall be allocated first to holders of allowed Class 2 claims through the date on which the allowed Class 2 claims shall have been paid in full, plus interest, and from and after that date the taxable income and the taxable losses of the Liquidating Trust shall be allocated to the holders of allowed Class 3 interests.

7.  <u>TERMINATION OF LIQUIDATING TRUST</u>

7.1  <u>Termination of Liquidating Trust</u>. The Liquidating Trust will terminate on the earlier of: (a) the liquidation, administration and distribution of the Trust Assets and the Reserved Claims, as that term is defined in the Plan, in accordance with the terms of this Trust Agreement and the Plan, and the full performance of all other duties and functions set forth herein or in the Plan; and (b) the fifth (5th) anniversary of the Effective Date, unless extended by the Bankruptcy Court. The aggregate of all such extensions shall not exceed three (3) years, unless the Trustee receives a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust within the meaning of Treasury Regulations Section § 301,7701¬4(d) for federal income tax purposes. The Trustee shall not unduly prolong the duration of the Liquidating Trust and shall at all times endeavor to resolve, settle or otherwise dispose of all claims that constitute Trust Assets and to effect the distribution of the Trust Assets to the holders of the Liquidating Trust Interests in accordance with the terms hereof and terminate the Liquidating Trust as soon as practicable. Prior to and upon termination of the Liquidating Trust, the Trust Assets will be distributed to the holders of Liquidating Trust Interests, pursuant to the provisions hereof. If any Trust Assets are not duly claimed, such Trust Assets will be redistributed to all other holders of Liquidating Trust

14

Interests receiving Trust Assets pursuant to the terms hereof. The Trustee shall be entitled to take all steps necessary to terminate the Trust, as provided above, without further order of the Bankruptcy Court.

8.    AMENDMENT AND WAIVER

    8.1    Amendment and Waiver. Any substantive provision of this Trust Agreement may be amended or waived by the Trustee upon approval of the Bankruptcy Court. Notwithstanding this Section, any amendments to this Trust Agreement shall not be inconsistent with the purpose and intention of the Liquidating Trust to liquidate in an expeditious but orderly manner the Trust Assets in accordance with the Plan and Treasury Regulations Section 301.7701-4(d).

9.    MISCELLANEOUS PROVISIONS

    9.1    Intention of Parties to Establish Liquidating Trust. This Trust Agreement is intended to create a liquidating trust for federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as such a trust and any ambiguity herein shall be construed consistent herewith and, if necessary, this Trust Agreement may be amended to comply with such federal income tax laws, which amendments may apply retroactively.

    9.2    Preservation of Privilege and Defenses. Any attorney-client privilege, work-product privilege or other privilege or immunity to which the estate or the Debtor are entitled shall vest in the Liquidating Trust, and the Trustee of the Liquidating Trust shall be entitled to assert such privilege or immunity to the extent that the Debtor or the estate would be entitled prior to the Effective Date of the Plan. The Trustee shall be entitled to waive any privilege or immunity in his or her sole discretion.

    9.3    Cooperation and Further Assurances of the Debtor. The Debtor shall, upon reasonable request of the Trustee, execute, acknowledge, and deliver such further instruments and do such further acts as may be necessary or proper to transfer to the Trustee any portion of the Trust Assets intended to be conveyed in the form and manner provided for in the Plan and to vest in the Trustee the powers, instructions, or funds in trust hereunder. The Debtor, for itself and any predecessor or successor entity, hereby disclaims and waives any and all rights to any reversionary interests in any of the Trust Assets. The Debtor shall upon the request of the Trustee relinquish to the Trustee its books and records.

    9.4    Laws as to Construction; Jurisdiction of Bankruptcy Court. This Trust Agreement shall be governed and construed in accordance with the laws of the State of California, without giving effect to rules governing the conflict of laws, and federal bankruptcy law to the extent applicable. For so long as the Chapter 11 Case may be pending, the Bankruptcy Court shall have exclusive jurisdiction to resolve any matters concerning the interpretation or enforcement of this Trust Agreement, and any disputes arising thereunder or in connection therewith between or among the Trustee and the Debtor, any holder of any Liquidating Trust Interest and any other party in interest.

    9.5    Severability. If any provision of this Trust Agreement or the application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be

Case: 19-40363    Doc# 235-2    Filed: 06/05/2020    Entered: 06/05/2020 14:06:38    Page 62 of 64
67763086v10

invalid or unenforceable to any extent, the remainder of this Trust Agreement, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

9.6     Notices. Any notice or other communication hereunder shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or letter box addressed to the person for whom such notice is intended:

**If to the Trustee:**

> Aradigm Corporation Liquidating Trust
> c/o Susan L. Uecker, Liquidating Trustee
> Uecker & Associates, Inc.
> 1613 Lyon Street, Suite A
> San Francisco, Ca 94115

**If to the holders of Interests in the Liquidating Trust:**

For each holder that is a creditor, notices shall be sent to the address on such holder's proof of claim filed with the Court (or if no proof of claim has filed, the address shown for such claimant in the Debtor's schedules), unless such holder has since (1) filed a change of address notification with the Court, or (2) following the Effective Date, notified the Trustee in writing of such holder's change of address.

For each holder that is a shareholder, notices shall be sent to the holder's address as shown  the Debtor's shareholder records as of April __, 2020, unless such holder has since (1) filed a change of address notification with the Court, or (2) following the Effective Date, notified the Trustee in writing of such holder's change of address.

**If to Bleichroeder:**

> Bleichroeder LP
> Attn: Michael Kellen
> 1345 Avenue of the Americas, 47th Fl
> New York, NY 10105

9.7     Headings. The section headings contained in this Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Trust Agreement or of any term or provision hereof.

9.8     Relationship to the Plan. The principal purpose of this Trust Agreement is to aid in the implementation of the Plan and therefore this Trust Agreement incorporates the provisions of the Plan. If any provisions of this Trust Agreement are found to be inconsistent with the provisions of the Plan, the provisions of the Plan shall control.

16

IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Trust Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as of the date first above written.

ARADIGM CORPORATION


By:_____


ARADIGM CORPORATION LIQUIDATING TRUST


By:_____
    Susan L. Uecker
    Trustee

67763086v10